No. 4:19-cv-02588-YGR

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA AT OAKLAND

Chapter 13 Bankruptcy Case No. 14-44083 CN13

In the Matter of:
SARAH-JANE PARKER,
Debtor.

---

BAYSIDE COURT OWNERS ASSOCIATION, ET AL,
Appellants and Cross-Appellees,

v.

SARAH-JANE PARKER,
Appellee and Cross-Appellant.

---

Appeal from the United States Bankruptcy Court
for the Northern District of California
Hon. Charles Novack

———————————

**APPELLEE'S OPENING BRIEF AND OPENING BRIEF ON
CROSS-APPEAL**

———————————

Marlene A. Fong, SBN 111560.
FONG & FONG, APC
2161 Harbor Bay Parkway
Alameda, California 94502
(510) 748-6800
*marlene.fong@fonglaw.com*

Christina L. Henry, WSBA 31273
Appearing Pro Hac Vice
HENRY & DEGRAAFF, P.S.
787 Maynard Avenue S
Seattle, Washington 98133
(206) 330-0595
*chenry@hdm-legal.com*

*Attorneys for Appellee/Cross-Appellant Sarah-Jane Parker*

# TABLE OF CONTENTS

PART ONE: ANSWERING BRIEF OF APPELLEE SARAH-JANE PARKER ...................................................................................................1

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF THE CASE ............................................................3

   A.    RELEVANT FACTS ...................................................................3

       1.   Background.............................................................................3

       2.   The Bankruptcy ....................................................................5

       3.   The Stay Violations ..............................................................6

       4.   The Discharge Violations ....................................................9

   B.    RELEVANT PROCEDURAL HISTORY ...............................9

III. STANDARD OF REVIEW .............................................................10

IV. SUMMARY OF THE ARGUMENTS............................................12

V. ARGUMENT ....................................................................................15

   A.    THE BANKRUPTCY COURT CORRECTLY FOUND THAT BCOA REPEATEDLY VIOLATED THE STAY. ............................................15

       1.   This Court should affirm the bankruptcy court's ruling that the "late payment demands" violated the automatic stay. ............................15

       2.   The bankruptcy court correctly found as a fact that the disciplinary fines were for pre-petition conduct and conditions, and also were harassing. ........................................................................20

       3.   The bankruptcy court's finding that BCOA's settlement demands were harassing and punitive attempts to collect pre-petition claims is correct and is abundantly supported in the evidence. .................23

       4.   BCOA had no right to seize and rent Parker's property and keep the revenue for itself. .............................................................24

   B.    THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S DAMAGES AWARD.............................................................27

       1.   The bankruptcy court correctly found the factual elements needed for emotional distress to be abundantly present. ............................27

       2.   The bankruptcy court correctly ruled that emotional distress damages are an inherent part of "damages" under 362(k)(1) and do not need to be separately stated in the pretrial order. ......................30

3.   The bankruptcy court's finding that BCOA acted with "callous and reckless disregard for the law" and its award of punitive damages should be affirmed. ..........................................................32

4.   The bankruptcy court correctly found on the evidence that Jennings and Patel violated the stay. ..............................................34

5.   Neither the Bankruptcy Act nor state law exempt HOA directors and officers from complying with bankruptcy laws. .......................36

C.   THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S FEE AWARD. ........................................................................39

1.   Parker's attorney fee application is supported by detailed and complete documentation and is presumed reasonable and awardable. ................................................................39

2.   BCOA's accusation regarding "nonconpensable work" is patently refuted by the record. ...................................................41

3.   The court correctly found that BCOA did not prove its affirmative defense of "inadequate attempts to mitigate damages." ................43

4.   The discharge order eliminated the underlying assessment obligation and with it the lien. No law requires a debtor to warn a creditor to stop violating the stay. ...................................45

5.   BCOA caused all the fees incurred in this case by its own unlawful and reprehensible conduct. ..............................................47

PART TWO: OPENING BRIEF ON CROSS APPEAL ..................................50

I. ISSUES ON CROSS APPEAL .....................................................50

II. INTRODUCTION AND SUMMARY OF ARGUMENT ...........................50

III. ARGUMENT ..................................................................52

A.   THE COURT APPLIED THE WRONG LAW TO PARKER'S STAY VIOLATION CLAIM AS TO POST-DISCHARGE ACCRUAL OF DAMAGES. ..........................................................................52

1.   The bankruptcy court erred by cutting off damages for the stay violations at the date of the discharge, in contravention of established law. ..............................................................52

B.   THE COURT APPLIED THE WRONG LAW TO PARKER'S CONTEMPT CLAIMS .........................................................55

1.   The bankruptcy court erred by applying the wrong law to Parker's contempt claims arising from the discharge violations and stay

violations, a per se abuse of discretion that mandates reversal and remand. ...................................................................................55

2. Parker will likely prevail on remand, and thus reversal is appropriate. ...................................................................................58

3. Parker was deprived of a fair trial as to the $78,000 in "rent" seized by BCOA post-discharge. ..............................................................60

4. The court erred by applying the wrong law to the contempt inherent in the stay violations. .....................................................................61

IV. CONCLUSION ................................................................................62

CERTIFICATE OF COMPLIANCE ...............................................................64

iv

# TABLE OF AUTHORITIES

**Cases**

*Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226 (1995) ..............................46

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985) ..........................................11

*Bank of New York Mellon v. Watt*, No. 14-cv-02051-AA, 2015 WL 1879680 (D. Or. April 22, 2015)...........................................................................................25

*Bibeau v. Pac. Nw. Research Fund, Inc*., 188 F.3d 1105 (9th Cir. 1999)...........59

*California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 618 (1885) ...........56

*Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007)...........................................38

*Diamond v. Superior Court*, 217 Cal.App.4th 1172 (2013) ................................16

*Easley v. Cromartie*, 532 U.S. 234 (2001)..........................................................10

*Ellett v. Stanislaus*, 506 F.3d 774 (9th Cir, 2007)...............................................45

*Eskanos & Adler LLC v. Roman (In re Roman)*, 283 BR 1 (9th Cir. BAP 2002) ....................................................................................................................passim

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1 (1947) ...............60

*Fisher v. Tucson Unified Sch. Dist*., 652 F.3d 1131 (9th Cir. 2011) ..................10

*Franken Invs. Inc. v. City of Flint*, 218 F. Supp. 2d 876 (E.D.Mich. 2002).......59

*Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992).........................................40

*Goudelock v. Sixty-01 Association of Apartment Owners (In re Goudelock)*, 895 F.3d 633 (9th Cir. 2018)............................................................................passim

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .......................................................40

*In re Castellino Villas*, 836 F.3d 1028 (9th Cir. 2016)......................................21

*In re Crow Winthrop Operating P'ship*, 241 F.3d 1121 (9th Cir. 2001).............11

*In re Dawson*, 390 F.3d 1139 (9th Cir. 2004)........................................28, 30, 31

*In re Freeman*, 609 B.R. 228 (9th Cir. BAP, November 5, 2019) .....................57

*In re Fuller*, 134 B.R. 945, 947 (9th Cir. BAP 1992).........................................17

*In re LeGrand*, __ B.R. __ (Bankr. E.D. Cal. Feb. 6, 2020)........................54, 61

*In re Manoa Fin. Co. Inc*, 853 F.2d 687 (9th Cir. 1988)....................................49

*In re Martin*, 491 B.R. 122 (Bankr. E.D. Cal. 2013).........................................46

*In re Morgan Guaranty Trust Co,* 804 F.2d 1487 (9th Cir. 1986) .....................22

*In re Pratt*, 462 F.3d 14 (1st Cir. 2006)...............................................25

*In re Rosa*, 495 B.R. 522 (Bankr. D. Haw. 2015) ............................................25

*In re Schwartz-Tallard*, 803 F.3d 1095 (9th Cir. 2015)................................41, 49

*In re Snowden*, 769 F.3d 651 (9th Cir. 2014) ................................................passim

*In re Spencer*, 457 BR 601 (E.D. Mich. 2011) ...................................................25

*In re Warren*, No. 15-CV-03655-YGR, 2016 WL 1460844 (N.D. Cal. April 13, 2016)..............................................................................................16

*Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011)....................................................11

*Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999) ...................................33

*Koon v. United States*, 518 U.S. 81 (1996).........................................................11

*Missoula Fed. Credit Union v. Reinertson*, 241 B.R. 451 (9th Cir. BAP 1999).11

*MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910 (9th Cir. 1996).........38

*Newport v. Fact Concerts, Inc*., 453 U.S. 247 (1981) ........................................32

*O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000).........................21

*Olomi v. Tukhi*, 568 B.R. 107 (9th Cir. BAP 2017)............................................11

*Orian v Asaf*, 2018 Bankr. LEXIS 3734 (9th Cir. BAP, Nov. 27, 2018) ......32, 40

*Oswalt v. Resolute Indus. Inc.*, 642 F.3d 856 (9th Cir. 2011) .............................11

*Razzak v. Bank of America, N.A*., No. 17-CV-04939-MMC (N.D. Cal. March 28, 2018) ........................................................................................................25

*Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382 (9th Cir. 1994) .......11

*Strauss v. Comm'r of the Soc. Sec. Admin*., 635 F.3d 1135 (9th Cir. 2011) .......11

*Sundquist v. Bank of America, N.A.* 566 B.R. 563 (Bankr.E.D.Cal. 2017) .passim

*U.S. v. Hinkson,* 585 F.3d 1247 (9th Cir. 2009) (en banc) ...........................11, 58

*United States v. Stanley*, 653 F.3d 946 (9th Cir. 2011) .......................................11

**Statutes**

11 U.S.C. § 105(a) .................................................................................11, 26

11 U.S.C. § 1306(a) .......................................................................................38

11 U.S.C. § 1327(b) .......................................................................................24

vi

11 U.S.C. § 362(a) ........................................................................37

11 U.S.C. § 362(a)(4) ....................................................................17

11 U.S.C. § 362(a)(5) ....................................................................17

11 U.S.C. § 362(a)(6) ....................................................................21

11 U.S.C. § 362(c)(1) .....................................................................24

11 U.S.C. § 362(k)(1) ...............................................................passim

11 U.S.C. § 523(a)(16) ..................................................................37

Cal. Civ. Code 5650(b) .............................................................16, 26

Cal. Civ. Code 5660 ..................................................................15, 16

Cal. Civ. Code 5700 ........................................................................26

Cal. Corp. Code 7231.5 .............................................................36, 37

**Rules**

Fed. R. Civ. P. 15(b) ......................................................................30

Fed. R. Civ. P. 52(a).......................................................................10

# PART ONE: ANSWERING BRIEF OF APPELLEE SARAH-JANE PARKER

# I. INTRODUCTION

A homeowner who purchases a unit in a residential community has a reasonable expectation that the rules she agreed to at the point of purchase will not be retroactively and punitively changed underneath her. This is the story of a homeowners' association that changed those rules in order to pursue a single resident so zealously that it drove her to bankruptcy, then drove her out of her home, and then violated federal bankruptcy law in an obsessive attempt to lay its hands on what assets remained to her. The integrity of the bankruptcy system demands that the association not be allowed to prevail.

Sarah-Jane Parker won at trial, proving that creditor Bayside Court Owners Association ("BCOA") repeatedly violated the automatic stay and is liable for damages under 11 U.S.C. § 362(k)(1). The court awarded appropriate attorney's fees to Parker commensurate with the three years of intense litigation attributable to BCOA's acts. BCOA does not like this result and wants a do-over.

BCOA contends the bankruptcy court should have reached a different factual conclusion on every one of its findings that BCOA violated the automatic stay, that the violations inflicted severe and long-lasting emotional

1

distress, that the violations were done in flagrant disregard of the law, and that BCOA's agents are personally liable for some of the resulting damages. BCOA does not challenge any of the evidence relied on by the court, which consists largely of BCOA's own internal records. BCOA also contends that the court made yet more factual errors by awarding about three-fourths of the attorney's fees requested by Parker under § 362(k)(1).

BCOA fails to prove that the court's findings were "clearly erroneous" and that the award of damages was an "abuse of discretion." This court should affirm the ruling of the bankruptcy court as to the stay violations, damages, and award of attorney's fees.

However, the court erred by cutting off damages for the continuing stay violation at the date of the discharge, contrary to established law, requiring reversal and remand. The court also erred by applying the wrong law to Parker's discharge violation and contempt claims, a per se abuse of discretion. The sole case relied on by the court was overruled by the U.S. Supreme Court on June 3, 2019, requiring reversal of the court's rulings denying relief for the discharge and contempt claims. This court should reverse and remand to the bankruptcy court for findings and an award of damages under the correct law.

## II. STATEMENT OF THE CASE

## A. RELEVANT FACTS

### 1. Background

Bayside Court opened in 2000, a 33-unit condo conversion in a former
Oakland warehouse. The largest unit is 990, purchased by Sarah-jane Parker in
2005.[1]  Annual assessments are calculated by the formula set out in Article 6.2.3
of the Covenants, Conditions & Restrictions (CC&Rs). Items in the budget for
reserves for painting and roof replacement, and current expenses for insurance
and common area utilities, are allocated to a given unit based on its size; all
other items in the budget are equally divided among all units. The combined
figure is the assessment for the unit. For unit 990 the split was about 50-50
between the two categories. The annual assessment averaged about $7,000 per
year for Unit 990 from 2000 through 2012.

This changed with the election of Laurence Jennings to the board in 2012.
Disregarding the plain language of Article 6.2.3, in October 2012 the Jennings-
led board decreed that all past boards, the Department of Real Estate, and the
project developer who wrote the CC&Rs had all misinterpreted Article 6.2.3.
Instead, the new board announced that the entire assessment should be based

---

[1]  Parker's "unit" is actually a separate building from the warehouse, built 20 years later in
1945. The warehouse contains the other 32 units.

3

only on the size of the unit, not split between fixed and variable costs as 6.2.3 unambiguously provides. The board immediately re-assessed all units using this new formula. At nearly 7,000 square feet, this change affected Parker's unit far more than the other units, mostly in the 1000 square foot range. The board declared that the assessment on Parker's Unit 990 would be $17,000 per year, not $7,000. This was quickly changed to $19,000 per year, and then to $22,500 per year in January 2013. This scheme resulted in 27 units having their assessments reduced, including units owned by board members. None had an increase close to Parker's.

BCOA filed a civil suit against Parker in May 2013 to collect the unlawful assessments. Parker responded with a cross-complaint challenging the validity of the assessments and alleging breach of fiduciary duty arising from BCOA's conduct.

In September 2013 the board decreed that the "revised" assessments would be applied *retroactively,* to years 2009 through 2012 inclusive. BCOA assessed Parker $43,979 for those years, plus revoked a $4,332 credit allowed by a prior board for over-assessing Parker.

Not content with the assessment increases, the Jennings-led board began fining Parker $1,500 per month for supposed "tenant violations" in July 2013. BCOA imposed $26,000 in such fines from July 2013 to October 2014. Parker was a full-time resident in her unit at all times.

4

In just two years the Jennings-led board ran up more than $163,000 in assessments, penalties, fines and other charges against Parker at a time when the lawful assessment was about $7,000 per year.[2]

## 2. The Bankruptcy

By late 2014, with her unit's value less than the mortgage balance, weary of the constant assault by the Association, fearful of the ever-increasing claims, and unable to continue to afford litigation, Parker reluctantly decided to file a Chapter 13 bankruptcy. Parker filed her case on October 8, 2014. Parker listed BCOA's claim on Amended Schedule D as "disputed" and "unliquidated" and the amount as "unknown." Parker's plan provided for all pre-petition secured claims, including BCOA and the two mortgage lenders, by "surrendering" her Unit 990 in place of any payments. The plan proposed to pay up to $23,597 in unsecured claims. No creditor objected to the plan and it was confirmed on December 17, 2014.

On October 29, 2014 Parker offered in writing to convey her property by deed to any secured creditor who wished to take it. BCOA did not respond nor did the other secured creditors. BCOA never took any steps to foreclose on its

---

[2]  The unlawful assessments set the stage for the bankruptcy and the stay violations, but the assessments are not at issue in this appeal. The *amount* of the pre-petition claims is not per se relevant to the appeal, only the fact that appellants sought to collect a pre-petition claim.

secured claim, despite obtaining an unnecessary relief from stay to foreclose on April 20, 2015.

Desperate to escape the intimidating atmosphere at Bayside Court, Parker moved out of her unit in November 2014, to live with friends in Texas. She did not rent out the unit, and had friends continue to check on its condition in her absence.

BCOA did not make the unsecured claim anticipated by the plan. As a result, Parker paid off all claims earlier than expected and received a discharge on December 1, 2015.

### 3.  The Stay Violations

BCOA refused to acknowledge that its pre-petition claims of more than $162,000 would not get paid in cash and that BCOA's sole remedy was to take title to Parker's unit and sell or rent it. This refusal to accept the reality of bankruptcy law is the genesis of all the violations that followed. BCOA deployed a multitude of schemes to "recover" the money it felt it was losing to bankruptcy, regardless of the law.

BCOA began violating the stay almost immediately. BCOA sent Parker an aggressive "settlement" demand on October 29, 2014, demanding payment of $25,000 in pre-filing claims, plus attorney's fees and a long list of other demands, threatening to prosecute the pending (and stayed) civil suit, force

dismissal of the bankruptcy case, and more. BCOA's attorney sent a virtually identical demand to Parker on December 15, 2014.

BCOA sent Parker a "Late Payment Demand" on December 2, 2014 demanding payment of more than $162,000 in the pre-filing assessments and fines. BCOA sent a second "Late Payment Demand" on January 2, 2015, again demanding the same $162,000 in pre-filing claims but adding $22,000 in fiscal 2015 assessments.

BCOA resumed its program of punitive fines starting in December 2014, imposing fines for a variety of groundless supposed rules violations. The fines added up to $12,846 by April 30, 2015. The supposed conditions on which the fines were based all pre-dated the case filing.

After realizing that it was not going to recover its $162,000 in pre-filing claims by foreclosing and taking title, BCOA changed tactics in early 2015. Jennings and the board conceived the idea of simply seizing possession of Parker's vacant unit, renting it out, and keeping all the money. With the connivance of BCOA's attorney at the time, BCOA prepared a "lease" for Unit 990, hired a rental agent, advertised the property claiming to be the landlord, and in May 2015 "rented" Parker's property to a tenant. The rent was $6,500 per month, with a $19,500 advance payment. BCOA did not seek or obtain Parker's consent, or the bankruptcy court's consent, for any of this.

7

Meanwhile, Jennings and his board prepared a raft of amendments to the CC&Rs that would supposedly legitimize the seizure of Parker's property, as well as the retention of all the rental income. The "June Ballot Initiative" distributed in May 2015 told the members that the assessments on 990 had always been far too low, that a great injustice was being done to the other owners forced to pay too much, and that it was essential to rent out Parker's unit, keep all the money, and credit nothing to Parker's assessment account or any other claim BCOA asserted against Parker. Using proxies collected from the members, the board voted to approve these proposals. Again, the consent of Parker and the court was not obtained.

BCOA collected $128,500 in "rent" from May 2015 through December 2016, when the mortgage lender Deutsche Bank conducted its own foreclosure sale and took title. BCOA paid nothing towards the mortgage while collecting rent. None of this $128,500 was ever paid to Parker.

Parker had held out hope that BCOA would take title to the unit and release her from ongoing liability, after offering to convey the property in October 2014 and after BCOA obtained relief from stay to foreclose in April 2015. By August 2015 it became clear to Parker that BCOA had no intention of taking the property. Parker decided to go forward with the motion for sanctions for violation of the automatic stay. The motion was filed on November 3, 2015.

8

### 4. The Discharge Violations

BCOA did not alter its conduct after the discharge issued on December 1, 2015 despite being aware of the discharge. BCOA continued renting out Parker's Unit 990, collecting and keeping $78,000 from December 2015 through December 2016. On December 15, 2015 BCOA imposed $24,285 in assessments for fiscal 2016. BCOA issued another "Late Payment Demand" on April 2, 2016, demanding $81,855 in claims, including $9,856 in "retro assessments" for years 2010 to 2014.

BCOA never came to the Bankruptcy Court to seek a ruling on whether its conduct was permissible, despite the clear warnings in the November 3, 2015 stay violation motion that its conduct was unlawful.

## B. RELEVANT PROCEDURAL HISTORY

Parker filed her Chapter 13 case on October 8, 2014. On November 3, 2015, Parker filed her motion for sanctions and damages for violation of the automatic stay. (ECF Doc. #71.) Parker made all plan payments and received a discharge on December 1, 2015. Parker filed her motion for sanctions for violation of the discharge injunction on December 15, 2016. (ECF Doc. #129.) The matter went to a bench trial on the stay violation, contempt, and discharge violation claims on May 29, 2018 and concluded on August 21, 2018. The parties submitted post-trial briefs on October 12, 2018.

The court issued its Memorandum Decision After Trial (ECF Doc. #299) on January 29, 2019 (hereafter "Decision" or "Dec."), largely agreeing with Parker on the stay violation claims, but finding no contempt for violation of the discharge injunction or stay violations. The court awarded Parker attorney's fees under 362(k)(1). The court issued its Judgment on April 11, 2019, awarding a total of $433,116.95 as damages against BCOA, of which Jennings and fellow board member Raj Patel are jointly and severally liable for $39,000.00. (ECF Doc. #316.)

## III. STANDARD OF REVIEW

The standard of review for findings of fact is "clear error," which is significantly deferential to the trial court, requiring a "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001); *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1136 (9th Cir. 2011). Fed. R. Civ. P. 52(a) provides "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." If the trial court's account of the evidence is plausible in light of the entire record, the reviewing court may not reverse, even if it would have weighed the evidence differently. This applies to findings of fact after a bench trial, as here (*Oswalt v. Resolute Indus. Inc.*, 642 F.3d 856, 859

10

(9th Cir. 2011)), and applies both to findings on oral testimony and documentary evidence. *United States v. Stanley*, 653 F.3d 946, 952 (9th Cir. 2011); *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 384 (9th Cir. 1994). Special deference is paid to a trial court's credibility findings. *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). Factual findings are not clearly erroneous unless they are "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from facts in the record." *Olomi v. Tukhi*, 568 B.R. 107, 112-13 (9th Cir. BAP 2017), citing *U.S. v. Hinkson,* 585 F.3d 1247, 1261-2 (9th Cir. 2009) (en banc).

An award or denial of sanctions under 11 U.S.C. § 105(a) is reviewed for abuse of discretion. *Missoula Fed. Credit Union v. Reinertson*, 241 B.R. 451, 454 (9th Cir. BAP 1999). A court abuses its discretion when it applies the wrong law to the facts (*Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011); *U.S. v. Hinkson*, supra, 1262) or by erroneously interpreting a law or resting its decision on an inaccurate view of the law. *Koon v. United States*, 518 U.S. 81, 100 (1996); *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1137 (9th Cir. 2011). A District Court reviews the Bankruptcy Court's conclusions of law de novo. *In re Crow Winthrop Operating P'ship*, 241 F.3d 1121, 1123 (9th Cir. 2001). The first step in the abuse of discretion test is to determine de novo whether the trial court applied the correct law to the relief requested. If not, the ruling is an abuse of discretion. *Hinkson*, supra, 1262.

11

# IV. SUMMARY OF THE ARGUMENTS

1. Payment Demands. BCOA's December 2, 2014 and January 2, 2015 "Late Payment Demands" were attempts to collect the $162,000 in pre-petition assessments, penalties, fines and other charges that BCOA believed it was "losing" to the bankruptcy. The invoices explicitly demand immediate payment, as do the cover emails sent directly to Parker by BCOA with the payment demands. The demands were also harassing and oppressive, an independent stay violation.

2. Fines. The fines and penalties imposed on Parker soon after the case was filed were based on pre-filing conditions and conduct, and thus were within the scope of the stay. The court further found that one motive for the fines was to punish Parker for filing a bankruptcy case and discharging BCOA's claims, thus were harassing and oppressive in addition to being pre-petition claims.

3. Settlement Demands. The October 29, 2014 and December 15, 2014 "settlement demands" were attempts to collect pre-petition claims and were harassing and oppressive. The demands include payment of $25,000 in pre-filing claims; threats to revive and expand pre-filing civil litigation stayed by the bankruptcy, to sue Parker's (non-existent) tenant, to sue Parker's realtor, to file "multiple adverse claims in the Bankruptcy Court," and more; plus a demand for payment of 60 percent of BCOA's liens against the property and payment of all of BCOA's legal fees. A settlement proposal violates the stay

when it is harassing or oppressive. The court found these settlement demands crossed the line by a wide margin. The content of the demands and the circumstances existing at the time, only a few weeks after the case was filed, support the court's findings.

4. Renting 990. BCOA had no right under Federal or California law or the CC&Rs to seize and rent out Parker's condominium, which is not among the "assessment collection" methods allowed by law. The "surrender" of the property in the plan did not transfer title or any ownership rights but was only a statement that Parker would not oppose a foreclosure. BCOA never acted on its ability to obtain title. Renting out the property to obtain cash money, while taking no steps to foreclose and obtain title, is not an "in rem" act. Since none of the $128,500 collected by BCOA was applied to Parker's assessment account, or any claim BCOA asserted against Parker or the property, this was not "collection of assessments." The evidence proved that BCOA's motive and intent was to collect the pre-petition claims BCOA felt it was "losing" to the bankruptcy.

5. Emotional Distress. Damages for emotional distress caused by a stay violation are properly awarded when the distress is significant, is clearly established, and a causal link exists between the violation and the emotional distress. The distress may be proved by the testimony of the victim, when circumstances make it obvious that a reasonable person would suffer significant

13

emotional harm. The court found all these circumstances to be proved by the evidence. The court found Parker's testimony "was credible, and given the duration of BCOA's violations, her distress was not fleeting." There is no need for "corroborating" evidence from medical experts under these circumstances.

6. Punitive Damages. The evidence proved that BCOA acted with such "reckless disregard for the law" that punitive damages were appropriate. BCOA does not show how the court's findings on the facts are "clearly erroneous" and that the award of damages was an "abuse of discretion."

7. Personal Liability. Board members Jennings and Patel personally conceived and implemented the acts that violated the stay, therefore are personally liable under 362(a), which is "applicable to all entities." They are liable for violation of a Federal statute, not for imposing assessments. The state-law statute shielding directors from state-law civil claims is irrelevant, plus Jennings and Patel did not prove that they are entitled to this affirmative defense in the first place. Such state laws are pre-empted by the comprehensive Federal system embodied in the Bankruptcy Code.

8. Attorney's Fees. The court carefully reviewed the entire fee application, covering three years of intense litigation caused entirely by BCOA's violations of the law and its scorched-earth litigation strategy. A reviewing court extends great deference to the bankruptcy court's "reasonableness" conclusions in fee awards. All the fees awarded are for work

14

on the stay violations, and BCOA does not point to a single hour of time for work on the "contempt" or "discharge violation" aspects of the case. BCOA failed to prove the affirmative defense of "failure to adequately mitigate damages." The evidence relied on by the court supports that finding. BCOA ignores the rule that in determining "reasonable" fees it is imperative "to consider who caused the attorney's fees to be incurred – the debtor or her creditors." BCOA brought this on itself and cannot complain about the fee award.

# V. ARGUMENT

## A. THE BANKRUPTCY COURT CORRECTLY FOUND THAT BCOA REPEATEDLY VIOLATED THE STAY.

### 1. This Court should affirm the bankruptcy court's ruling that the "late payment demands" violated the automatic stay.

*(a) The Payment Demands were not "notices" exempt from bankruptcy law.*

BCOA insists that its December 2, 2014 and January 2, 2015 "Late Payment Demands" (Trial exhibits F and H) were merely "notices" that would be allowed under Civil Code 5660. (Appellants' Opening Brief (hereafter "AOB") 16:23; 17:11-18.) Section 5660 provides that an HOA that wants to create a lien for assessments must first send a notice to the owner by certified mail containing a detailed list of information about the basis for the claim and the owner's rights to investigate the claim, demand documents, meet with the

15

board, request ADR, and other critical information. BCOA's attempt to bootstrap its "Late Payment Demands" into Civil Code 5660 "Pre-Lien Notices" fails.

First, the Late Payment Demands contain virtually none of the information and notifications of the owner's rights mandated by 5660 and its subparts (a) through (f). The words "Pre-Lien Notice" nowhere appear on the Payment Demands, indicating that giving "statutory notice" (AOB 17:14) to Parker was not the purpose of the Demands. These are plainly not "Section 5660 Pre-Lien Notices." Nor were they sent by certified mail. Notice requirements are strictly construed to protect the interest of the homeowner, such that "substantial compliance" is insufficient. *Diamond v. Superior Court*, 217 Cal.App.4th 1172, 1191 (2013); *In re Warren*, No. 15-CV-03655-YGR, 2016 WL 1460844 at *4 (N.D. Cal. April 13, 2016).

The language in the box at the bottom of each page of the Payment Demands is not "mandated state law disclosures." (AOB 20:1-2.) If this is a reference to Section 5660, none of the requirements of 5660 is met. To the contrary, the wording plainly demands immediate payment in cash money. Civil Code 5650(b) mentioned in the wording does not "mandate" anything but merely lists what an HOA can collect. Jennings' lay opinion about what the law "requires" (AOB 17:11-13) is irrelevant.

16

Second, under 11 U.S.C. § 362(a)(4) the automatic stay extends to "any act to create, perfect or enforce any lien against property of the estate." The December 2, 2014 Payment Demand was pre-confirmation, thus if intended as a pre-lien device of any kind the Payment Demand violated 362(a)(4) as an act against property of the estate. See *In re Fuller*, 134 B.R. 945, 947, 949 (9th Cir. BAP 1992).

Third, under 11 U.S.C. § 362(a)(5) the stay extends to "any act to create, perfect or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." The January 2, 2015 Payment Demand was post-confirmation, and thus was an act against the property of the debtor after the revestment of all estate property in Parker. More than $162,000 of the amount in the Demand had been billed pre-petition. Any act to collect by lien any claim that existed pre-petition violated 362(a)(5), both as to assessment installments billed prior to case filing and all later assessment claims. *Goudelock v. Sixty-01 Association of Apartment Owners* (*In re Goudelock*), 895 F.3d 633, 637-38 (9th Cir. 2018).

Lastly, BCOA's demands were for payment of money, not turnover of title to the property or any other act aimed at collecting a debt solely from disposition of the real property itself. The bankruptcy court expressly found that the Late Payment Demands were attempts to collect against Parker personally, not an exercise of foreclosure rights. (Decision pg. 17 fn. 19.) This was not any

17

kind of "in rem" act as urged by BCOA (AOB 17:21 to 18:11), and violated

362(a)(6).

*(b) The bankruptcy court correctly found the Late Payment Demands were unnecessary and were issued with the intent to pressure and harass Parker for no lawful purpose, violating 362(a)(6).*

The court also found the invoices unnecessary and harassing. Parker

included the estimated $161,000 pre-petition claim on her schedules (as

unliquidated and disputed) and was already "acutely aware" of the claim.

(Decision 13:4-12.) Also, Parker provided for the pre-petition claim by

surrendering the property in full satisfaction of all BCOA's pre-petition claims

and did not need further reminders of the claim. The court found as a fact that

one major purpose of the invoices was to pressure and harass Parker. (*Id*. 13:11-

18.)

BCOA argues the invoices were not coercive or harassing. Judge Novack

found they were. BCOA is just re-arguing the facts, contending the court *should*

have found the invoices to be harmless "requests for payment." BCOA says the

demands for payment contained "no threat to obtain a lien or other coercion."

(AOB 19:22.)[3]  In fact the invoices contain a lengthy statement of what BCOA

could or would do if immediate payment was not made. The email that was sent

with them (to Parker directly, not her attorneys) demanded immediate payment.

---

[3]  This argument contradicts BCOA's contention that the Payment Demands were intended to create a lien. (AOB 17:11-15.)

(Trial Exhibits F last page, Exhibit H first page.) This argument also ignores the fact that the payment demands included *$162,928 in pre-filing assessment claims*. Demand for payment of barred pre-petition claims is a classic stay violation and per se harassing and oppressive.

BCOA admitted the supposed "watermark" saying "for informational purposes only" was not on the invoices when sent. (Joint Pretrial Order, ECF doc. #259, 18:25 to 19:10; Trial transcript, ECF doc. #290, 603:19 to 604:10.) Regardless, such disclaimers are irrelevant when the invoices are sent with intent to harass. (Decision 13:7-12 and fn. 15.)

BCOA does not show how the court's findings on the purpose and effect of the invoices was clearly erroneous, lacking any plausible support in the entire record. The court also had the opportunity to consider the credibility of witnesses, especially Laurence Jennings. The court did not find Jennings or the other BCOA witnesses credible. The court also had all the documentary evidence showing a relentless and concerted effort to extract money from Parker post-petition and collect pre-petition claims, Trial Exhibits BZ ("50 accomplishments"), 35/M ("June Ballot Initiative") and AA ("potent plan") in particular.

BCOA also calls the court's finding that "any demand for payment violates the stay" an error. (AOB 19:24, referring to Dec. 17:11-13.) This argument ignores the holding in *Goudelock*, that all assessments are a pre-

petition claim under the definitions of "claim" and "debt" in the Code. *Goudelock*, 638. Thus, all attempts to collect assessments (even those first billed post-petition) do in fact violate the stay.

### 2. The bankruptcy court correctly found as a fact that the disciplinary fines were for pre-petition conduct and conditions, and also were harassing.

BCOA contends the court's finding that the disciplinary fines are for pre-petition acts and conditions is not supported in the evidence and was error. More precisely, BCOA contends the court erred in ruling that "issuing and informing Parker" of the fines violated the stay. (AOB 20:18-19.) Once again, appellants are just re-arguing the facts and wanted the trial court to make a different finding on the evidence.

BCOA fails to address the court's finding that virtually all the grounds for the fines existed pre-filing, thus are pre-petition claims. (Decision 14:1 to 15:16.) BCOA does not show how the court's finding of when the "rule violations" arose is clearly erroneous, and the evidence supports the court's findings. The court did not assess a stay violation for "issuing and informing Parker" of the fines, but because those pre-filing claims were within the scope of the stay after the case was filed on October 8, 2014. The court explains this in depth at Dec. 14:21 to 15:16.

The cases cited by appellants (*O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000) and *In re Castellino Villas*, 836 F.3d 1028 (9th Cir. 2016) ) have no relevance as they involved *discharge* violations, not *stay* violations. To the extent *Castellino* has any significance, it is consistent with *Goudelock's* holding that the extremely broad definition of "claim" includes any contingent liability or debt, no matter how remote or unliquidated. Conditions existing prior to case filing are within the scope of "claim" as defined and are covered by the stay under 362(a)(6). The issue is not whether the fines are ultimately dischargeable, but whether imposing them violated the stay. BCOA mistakenly confuses these issues. (AOB 20:23 to 21:11.)

The court also found one motive for the fines was to "punish Parker for filing a bankruptcy and discharging her HOA liability." (Dec. 15:14-15.) This is "harassment and oppression" sufficient to violate the stay, independent of the pre-filing time of the conduct at issue.

BCOA says "the undisputed trial evidence established that Appellants assessed the fines based upon post-petition findings of post-petition violations." (AOB 21:2-4.) In fact, the evidence was disputed, and the court found as a matter of fact that the "claims" existed before commencement of the case. BCOA does not point to evidence that the conduct or conditions on which the fines were based occurred only after October 8, 2014 and was somehow misconstrued by the court. At Dec. 14:24-25 the court cites the evidence

21

showing that the grounds for the fines "pre-dated her bankruptcy." As such, the claims existed and could have been acted on before commencement of the case. *Goudelock*, 638.

   *In re Morgan Guaranty Trust Co,* 804 F.2d 1487 (9th Cir. 1986) does not say what BCOA contends and does not create any "safe harbor" for stay violators. (AOB 21:13-17.) To the contrary, it holds that the stay prohibits demands that "immediately or potentially threaten the debtor's possession of its property: commencement of judicial proceedings, [or] creation and enforcement of liens." (Id. 1491.) Further, only demands "unaccompanied by coercion or harassment" are allowed under the stay. (Id. 1491.) This is the *opposite* of what BCOA contends *Morgan Guaranty* stands for. BCOA's demands for payment threaten creation of a lien and can lead to a civil suit, exactly the kind of payment demands prohibited by BCOA's "authorities."

   The court found that the "retro assessment" (Exhibit V) announced May 15, 2015 for the years 2010 through 2014 inclusive was an attempt to collect a pre-petition claim. (Dec. 16:8-13.) *Goudelock* among other cases makes clear the broad scope of "claim" under the Code. Assessments that according to appellants could and should have been imposed prior to October 8, 2014 are patently "pre-petition" claims under long-established law as described in *Goudelock*. Appellants do not show how these findings of fact are "clearly erroneous."

22

### 3. The bankruptcy court's finding that BCOA's settlement demands were harassing and punitive attempts to collect pre-petition claims is correct and is abundantly supported in the evidence.

The court found that BCOA's "Settlement Demands" of October 29, 2014 and December 15, 2014 "were coercive, harassing attempts to collect a pre-petition debt and thus violated the automatic stay." (Dec. 12:13-14.) This is a "fact-driven inquiry" that takes all the circumstances into account. (*Id*. 12:10-12.) The court set out in detail the facts and circumstances that it considered. (*Id*. 3:11 to 4:2 and fn. 4; 12:13-25.)   The court concluded "The settlement demands were thus improper, willful attempts to collect pre-petition debt. They were harassing and coercive in nature, and were emblematic of BCOA's general disdain for the bankruptcy process." (*Id*. 13:1-2.)

BCOA is simply re-arguing the facts. It does not attempt to explain away the factual findings or the evidence on which the findings are based, but just urges that the court should have reached a different conclusion. BCOA ignores the threatening, aggressive language of both settlement demands, discussed in detail by the court. The court also had the benefit of evaluating the credibility of the author, Laurence Jennings, who the court found non-credible and disdainful of the bankruptcy process. (Dec. pgs 3-4 fn. 4.) BCOA does not show "clear error" in light not only of the settlement demands but the entire record.

23

### 4.  BCOA had no right to seize and rent Parker's property and keep the revenue for itself.

The court found that BCOA's seizure and rental of Parker's unit 990 was a scheme to recover the pre-petition assessments "lost" to the bankruptcy and violated the stay. The court refers to the "50 Accomplishments" memo (Ex BZ paragraphs 41, 44), saying "Jennings crowed about the Unit 990 lease, which allowed BCOA to 'recapture … costs & delinquent amounts from 990's unfortunate 2005-2015 member resident history.'" (Dec. 17:1-3.) The court recited the evidence showing that BCOA seized and rented Parker's unit to recover those pre-petition assessments. (Id. 7:10 to 9:11; 16:15 to 17:9.) The court held "BCOA violated the stay by attempting to collect a debt against Parker personally. It never attempted to foreclose on its liens." (Id. 17 fn. 19.) BCOA fails to show how this ruling is "clearly erroneous."

BCOA wrongly asserts, "*After confirmation, the Property was no longer subject to the stay*," citing 11 U.S.C. § 362(c)(1) and 1327(b). (AOB 22:21-22, italics added.) This fundamentally misconstrues the plain text of the statutes and the purpose of the automatic stay. Rather, 362(c)(1) protects "property of the estate" up until the time it revests in the debtor under 1327(b), after which 362(c)(2) extends the stay to "any other act under subsection (a) of this section." Subsection (a)(5) stays all acts to create or enforce a lien against "property of the debtor," while Subsection (a)(6) stays any act to collect or recover a pre-

petition claim against the debtor. BCOA is absolutely wrong in asserting that Parker's property, of every kind, "was no longer subject to the stay." The seizure and rental of Parker's property after it revested in her violated the stay.

BCOA also wrongly contends Parker's "surrender" of the property to provide for secured claims in her plan gave BCOA the right to seize and rent the property, despite no action by BCOA to *accept* the surrender by exercising its state-law foreclosure rights. (AOB 23:8-21.) See *In re Pratt*, 462 F.3d 14, 18-19 (1st Cir. 2006); *In re Rosa*, 495 B.R. 522, 523 (Bankr. D. Haw. 2015).

The Code does not define "surrender," but the courts, including the District Court for the Northern District of California, interpret it to mean the debtor "will make the property *available* so the secured creditor can, *if it chooses to do so*, exercise its state law rights in the collateral." *Razzak v. Bank of America, N.A*., No. 17-CV-04939-MMC (N.D. Cal. March 28, 2018) citing *Rosa*, supra, 523 (italics added). Surrender means "the secured creditor is free to accept or reject the collateral." *Bank of New York Mellon v. Watt*, No. 14-cv-02051-AA, 2015 WL 1879680, at *9 (D. Or. April 22, 2015).

"Unlike surrender, 'vesting … includes a present transfer of ownership.'" *Rosa*, supra, 523-24; *In re Spencer*, 457 BR 601, 612 (E.D. Mich. 2011); *Watt*, supra, 9. If the creditor takes no action to foreclose, as here, "surrender" has no effect on the debtor's continued right to control the property. *Rosa*, supra, 523.

25

If BCOA wanted to exercise the rights of an *owner*, such as renting out real property for $6,500 a month and keeping the money, it needed to foreclose or obtain a quitclaim or other title-changing document. It never did. Therefore, Parker owned all legal and equitable title to 990 until the foreclosure by the mortgage lender and recordation of the trustee's deed to Deutsche Bank on December 6, 2016.

The court did not "completely ignore" the effect of the "surrender" as BCOA contends (AOB 23:17) but rather, and correctly, ruled that the surrender did not give BCOA carte blanche to do whatever it wanted with Parker's property regardless of the law. BCOA clearly, and wrongly, believed it had such a "right." (Ex BZ paragraphs 41, 44; Ex AZ (lease) Part 0.1.)

The CC&Rs (Ex 8A sections 6.6.2, 6.6.3) do not include as an assessment-collection remedy "seizing and renting an owner's property and not allocating any of the money to any claim BCOA may have against the owner." Neither do the assessment collection provisions of Civil Code Secs. 5650(b) and 5700. Further, Civil Code Sec. 5655(a) provides that all money collected by an association must first be applied to the assessment balance.

BCOA also raises the unproved and irrelevant argument that it was merely collecting rent and "holding it for the senior lender." (AOB 14:16-17; 23:13.) BCOA floated this nonsensical contention at trial and was rebuked by the court. (ECF Doc. #291, Transcript 678-679, 700:16-19.)

26

Assessments, fines and related charges can only be imposed against the "owner" of the condominium. (CC&Rs Articles 6.1, 6.1.1, 6.6.3 (Ex. 8A); Civil Code 5650(a), 5660.) By imposing assessments for at least two fiscal years after Parker filed this case, and fines and other charges in mid-2015 long after the case was filed, BCOA conceded that Parker was the "owner" of the property. The earliest fine, on December 1, 2014, was for supposedly not informing BCOA of the identity of a tenant in Parker's unit. In fact there was no tenant, but BCOA at the time conceded that Parker had the *right* to have a tenant, thus had the right to control occupancy of her property. (Ex. I.) BCOA is judicially estopped from arguing that Parker was both the owner, subject to assessments, fines and other charges, and simultaneously was *not* the owner due to the "surrender" of the property in her plan. BCOA cannot have it both ways.

## B. THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S DAMAGES AWARD.

### 1. The bankruptcy court correctly found the factual elements needed for emotional distress to be abundantly present.

For more than two years after she filed her case, BCOA terrorized, harassed and oppressed Parker for having filed the case. BCOA deployed a swarm of tactics designed to intimidate Parker into abandoning her case, to pay over $160,000 in trumped-up pre-petition claims, to pay groundless "fines" based on supposed violations of rules made up by BCOA to oppress her, and a

27

dozen other bad-faith acts. BCOA seized her property without process of law and put a stranger into it, collecting $128,500 in "rent" without crediting anything to Parker's account.

The court found in favor of Parker on virtually every one of her claimed stay violations. The "settlement" demands were "coercive, harassing attempts to collect a pre-petition debt and thus violated the automatic stay." The threats in the settlement demands "were simply an attempt to make Parker's life miserable." (Dec. 12:13-14, 23-24.) The invoices demanding $162,928 in bogus pre-petition claims "were meant to harass Parker." They were "just more palpable evidence of BCOA's intent to pressure and harass Parker." (Id. 13:9-10, 16-17.) The fines imposed against Parker demonstrated BCOA's "desire to punish Parker for filing a bankruptcy and discharging her HOA liability." (Id. 15:14-15.) The twisted "grievance mentality" of BCOA and its directors is clear in the bizarre language of the June 2015 CC&R amendment proposal (Ex. M/35 parts [03] and [05]), aimed at Parker and published for all to see.

Emotional distress damages are available under 362(k)(1). *In re Dawson*, 390 F.3d 1139, 1148-49, 1151 (9th Cir. 2004); *In re Snowden*, 769 F.3d 651, 656-657 (9th Cir. 2014); *Sundquist v. Bank of America, N.A.* 566 B.R. 563, 587-588 (Bankr.E.D.Cal. 2017).

After carefully listening to Ms. Parker's testimony, and considering all the evidence written and verbal, the court found, "Parker's testimony was

credible, and it was sufficiently and obviously demonstrated that she experienced significant emotional harm, and that any reasonable person would have similarly suffered under the circumstances." (Dec. 18:17-19.) The court then summarized the facts that supported the finding of that significant emotional harm. (Id. 18:19 to 19:4.) The court concluded by saying "Her testimony was credible, and given the duration of BCOA's violations, her distress was not fleeting." (Id. 19:3-4.) These findings are bolstered by the fact that the court also imposed *punitive damages*: "Parker has established by a preponderance of the evidence that BCOA callously and repeatedly disregarded Parker's rights under the automatic stay," thus punitive damages were appropriate. (Id. 24:14-28.) Deliberate and callous behavior designed to harm Parker is more likely to cause emotional distress than lesser wrongful behavior.

BCOA's reference to other cases awarding only limited emotional distress damages is pointless and irrelevant. (AOB 24:22 to 26:3.) As the court said in *Sundquist* regarding whether to award emotional distress damages,

> "In the end it all adds up to a question of proof. If the court, in its capacity as trier of fact, is persuaded that significant harm has been clearly established and that there is a causal connection between the stay violation and the harm, then 362(k)(1) damages are appropriately awarded."

(*Id*. at 588.) So it is with this case. The facts in the other cases held up by BCOA are not the facts of this case and have no bearing on what the facts in this case proved. In any event none of the other cases involved literally dozens

29

of distinct, individual stay violations, coupled with behavior so reprehensible that punitive damages were necessary to drive home the point to the violator. BCOA has not shown that the court's findings were "clearly erroneous."

### 2. The bankruptcy court correctly ruled that emotional distress damages are an inherent part of "damages" under 362(k)(1) and do not need to be separately stated in the pretrial order.

BCOA's second contention, that evidence of emotional distress should not have been allowed "because" the Joint Pretrial Order supposedly does not refer to emotional distress, is likewise mistaken. The court correctly noted that emotional distress damages are an integral component of "actual damages" under 362(k)(1), citing *In re Dawson*, supra, 1148, 1151. (Dec. 17:26-28 fn. 20.) See also *In re Snowden*, supra, 656-657 and *Sundquist*, supra, 587-588. Parker did not need to add "and also damages for emotional distress" to the Pretrial Order list of issues.

The court correctly invoked Fed. R. Civ. P. 15(b) "Amendments During and After Trial," which provides at subpart (1),

> "(1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. *The court should freely permit an amendment* when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or the defense on the

> merits. The court may grant a continuance to enable the objecting
> party to meet the evidence." [Italics added.]

Fed. R. Civ. P. 15(b). The court concluded that this amendment, to the extent

any "amendment" was needed in the first place, was appropriate to aid in

presenting the merits. In response to BCOA's objection, the court told BCOA's

counsel "You knew what was coming here and to state otherwise … is not

really believable." (ECF Doc. #273, Transcript 27:12-17.) BCOA did not satisfy

the court that the evidence would prejudice its defense. Neither did BCOA ask

for a continuance, of any length, to enable it to meet the evidence.

BCOA's assertion that it was "not prepared for such testimony" is

unsupportable. Parker's November 3, 2015 motion for sanctions for stay

violations (ECF Doc. #71) alleges that Parker has suffered severe emotional

distress caused by BCOA's violations of the stay and cites extensively to the

authorities supporting an award of such damages in these circumstances,

including *Dawson* and *Snowden*. (Doc. #71 pgs. 37-39.) Parker's declaration in

support of the motion (ECF Doc. #74) describes the emotional distress she had

suffered as of that date, and was continuing to suffer, since the violations had

not stopped. Half the declaration, pages 6 through 14, describes Parker's

emotional reactions to the litany of violations perpetrated against her by BCOA.

Parker's December 15, 2016 motion for sanctions for violations of the

discharge order (ECF Doc. #129) likewise seeks damages for the continuing

31

emotional distress being suffered by Parker (pg. 29), and Parker's declaration in support of the motion (ECF Doc. #131) describes the nature of her emotional distress. BCOA cannot credibly assert it was "not prepared" to question Parker about her emotional distress. No error is shown.

### 3. The bankruptcy court's finding that BCOA acted with "callous and reckless disregard for the law" and its award of punitive damages should be affirmed.

Punitive damages may be awarded in 362(k)(1) cases where the evidence establishes "some showing of reckless or callous disregard for the law or the rights of others." *Snowden*, 657. Punitive damages serve two purposes: to punish outrageous conduct and to deter future similar conduct. *Sundquist*, supra, 588-89, citing *Newport v. Fact Concerts, Inc*., 453 U.S. 247, 266-67 (1981). See also *Orian v Asaf*, 2018 Bankr. LEXIS 3734 (9th Cir. BAP, Nov. 27, 2018) cited by the bankruptcy court. (Dec. 24:18-20).

The "callous and reckless disregard for the law or the rights of others" in *Snowden* was the creditor's failure to have in place a system to avoid violating the stay when making payment demands against a debtor. In *Sundquist* it was Bank of America's "cynical disregard for the law," repeatedly violating the debtors' rights. (*Id.* 610-611.) In the present case, Judge Novack pointedly found that BCOA had a very low regard for the law, as shown by its conduct throughout the case (Dec. 4:23-25 fn. 4; 13:23-28 fn. 15), and found as a fact

that "Parker has established by a preponderance of the evidence that BCOA callously and repeatedly disregarded Parker's rights under the automatic stay." (Id. 24:24-26.) The court made the award to "deter BCOA from violating the automatic stay in similar fashion in any future bankruptcy filed by one of its unit owners." (Id. 24:26-27.)

The punitive damage award is supported by Judge Novack's findings of BCOA's stay violations including the harassing and oppressive settlement demands, BCOA's efforts to collect patently pre-petition claims, BCOA's imposition of groundless and pre-petition-based disciplinary fines, imposition of "retro assessments" dating back years before the case was filed, seizing and renting Parker's condominium, and trying to collect barred post-petition assessments. The court found as a fact that this conduct resulted in long-lasting and significant emotional distress in addition to other losses and damages. This is more than enough "reckless indifference to the rights of others" to warrant punitive damages. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999), cited at AOB 28:6-7.

BCOA fails to show that these factual findings were "clearly erroneous" and it is obvious that no such showing can be made. BCOA also fails to show that the decision to impose punitive damages, and the amount thereof, was an "abuse of discretion." The reviewing court accords great deference to the discretion of the trial judge in making such findings.

33

BCOA's reference to the court's findings of "good faith belief" relates to Parker's *contempt* claims, not to BCOA's reckless disregard for the law, and is irrelevant. (AOB 28:8-11.)

### 4. The bankruptcy court correctly found on the evidence that Jennings and Patel violated the stay.

The bankruptcy court found that appellants Laurence Jennings and Raj Patel were individually liable, along with BCOA, for creating the "lease" and renting out Parker's condominium. The "lease" was a device to collect pre-petition claims and therefore violated the stay. (Dec. 9:12-16; 17:1-3; 20:5-10.)

Rather than respond to this factual finding, Jennings and Patel seem to be arguing that they are immune to the requirements of the stay because they "believed their assessments lawful" and had a "good faith belief that Parker was liable for post-petition assessments." (AOB 30:2-6.) Jennings and Patel do not attempt to show how the court's finding that the seizure and rental of 990 was to collect pre-petition claims was clearly erroneous. They do not even mention the lease.

Appellants' discussion of the "business judgment rule" and "BAMBI" (AOB 29-30) is irrelevant to any issue on appeal. The individuals were found liable for violating the stay, not for imposing assessments. Even a good faith belief that the stay is not being violated is not relevant to whether the act was

"willful" or whether compensation must be awarded under 362(k)(1). *In re Peralta*, 317 B.R. 381, 389 (9th Cir. BAP 2004); *Sundquist,* supra, 586-87.

In any event, seizing and renting Parker's condominium had nothing to do with "assessments." The supposed authority under which Jennings and Patel seized and rented the unit was the June 2015 cluster of CC&R amendments, Trial Exhibit M/35.[4]  Those amendments provide that the income from a seized unit "*shall not be used to reduce the delinquent Member Account balance in any manner whatsoever.* The lease proceeds are the permanent property of the BCOA, and no other entity shall have the right thereto, for any reason whatsoever." (Italics added.) This provision establishes that the seized money is **not** for assessments or any other claim against the unit owner. The court quoted this highly significant provision in its Decision at page 8 lines 15-17.

Further, as the court notes (Dec. 9:7-11) the money seized by BCOA "significantly exceeded Unit 990's yearly assessment." Thus, since it far exceeded even the claimed assessments, the majority of the money was **not** for assessments.[5]  BCOA does not dispute any of these findings of fact.

Appellants' assertion that they "complied with the Act and the CC&Rs" (AOB 29:25-26) is mistaken as well as irrelevant. Civil Code Sections 5600

_____

[4]  In fact, the lease was signed a month before the vote on the proposed amendments. Dec. 8:18-21.
[5]  BCOA collected $128,500 from May 2015 to December 2016, nearly three times the assessments claimed against Parker for that time period. Dec. 9:7-8; AOB 17:15.

35

through 5740 deal with imposition and collection of assessments. The limits of
what an Association can charge and collect when an assessment is delinquent
are set forth in Section 5650(b). The lien procedure is set forth in Section 5700.
Nothing in the Act empowers an association to seize and rent out the property of
a delinquent owner. Neither do the assessment collection provisions of the
CC&Rs, Sections 6.6.2 and 6.6.3. (Exhibit 8A.)

Jennings and Patel fail to show any error by the bankruptcy court.

### 5. Neither the Bankruptcy Act nor state law exempt HOA directors and officers from complying with bankruptcy laws.

Appellants appear to be arguing that they are privileged to violate the stay
and bankruptcy law generally, by virtue of being directors or officers of BCOA.
(AOB 30:9 to 32:15.) This contention is wrong and violates the fundamental
purposes of the Bankruptcy Act.

It is not even necessary to address the question of whether Section 362(a)
pre-empts Cal. Corp. Code Section 7231.5, as the court found to be the case. By
its own terms, Section 7231.5 only shields directors and officers from liability
for state-law claims when their duties are performed consistent with the three
criteria listed in the section. Jennings and Patel simply assume without evidence
that they did so. They do not point to any evidence in the record establishing
such "facts." The court's findings of fact as to the many breaches of Parker's
rights by Jennings and Patel is in effect a finding that the criteria of 7231.5 were

not met. The court found that Jennings and Patel failed to prove this affirmative defense. (Dec. 22:22-23.) They do not show how the court's factual findings are clearly erroneous.

Further, 7231.5 relates to claims "for alleged failure to discharge the person's duties as a director or officer." Jennings and Patel were not defending against such a state-law based claim, but rather a Federal charge for violation of the automatic stay, a completely unrelated matter in which belief, intent, and subjective factors are irrelevant.

BCOA's position amounts to a claim that HOA board members are free to disregard and violate the automatic stay, and bankruptcy law generally, so long as they subjectively "believe" that what they are doing is in "good faith" and meets the criteria of 7231.5. The protection of the stay could not survive such an assault, as demonstrated by the facts of this very case. Any HOA member in California who files for bankruptcy would have no protection under the automatic stay so long as the HOA's board members nursed a subjective belief that they were acting properly in collecting from that owner. If Congress intended to create such a startling exception to § 362(a) it would have done so expressly, as it did with 11 U.S.C. § 523(a)(16) (no discharge of post-petition-billed assessments in Chapter 7).

BCOA boldly but wrongly asserts "Congress evinced no intent to invalidate state corporate governance law protecting directors and officers by

37

enacting Section 362(k); such laws do not interfere with the purpose of Section 362," citing *Davis v. Yageo Corp.*, 481 F.3d 661, 679 (9th Cir. 2007). (AOB 31:24-27.) *Davis v. Yageo* holds no such thing and does not mention 362 at all. To the contrary *Davis v. Yageo* stands for the opposite: The Bankruptcy Act is supreme when the conduct at issue occurred during the bankruptcy. See *MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 913-914 (9th Cir. 1996) (a "mere browse" through Bankruptcy Code shows Congress's intent to create a uniform system that pre-empts state law; intent to pre-empt can be inferred). BCOA acknowledges in its brief that state laws are suspended when they conflict with the Bankruptcy Act. (AOB 30:18-19; 31:9-10.)

BCOA's other argument, that a debtor injured by a corporation that ignores the stay can get relief by suing the corporation, is ridiculous on its face and self-refuting. (AOB 32:5-13.) A person in bankruptcy by definition lacks the resources to launch a separate lawsuit against a well-funded corporate abuser. Plus, the potential proceeds of the suit would presumably be an asset, requiring amended schedules and an amended plan, distributing the proceeds among the creditors. 11 U.S.C. § 1306(a). This is a completely unworkable construct and shows why the automatic stay protects debtors against predatory HOAs like Bayside Court and its directors.

Jennings and Patel have not shown that the court abused its discretion in finding that federal bankruptcy law, not state corporate law, governs the relationship and duties of creditors and debtors after a case is commenced.

## C. THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S FEE AWARD.

### 1. Parker's attorney fee application is supported by detailed and complete documentation and is presumed reasonable and awardable.

Judge Novack concluded his Order Awarding Attorney's Fees and Costs by saying, "This contested matter was hard fought, substantial litigation which addressed several novel issues. The fee award is therefore reasonable." (ECF Doc. #315, Order, 5:9-10.) BCOA's opening remark that "The bankruptcy court improperly failed to find Fong [sic] attorney's fees to be reasonable before granting the award" (AOB 33:6-7) is simply wrong.

BCOA urges that the court was required to scour the entire fee request and make findings as to each hour of the request. BCOA contends the court only reviewed $90,000 of the request and argues the $369,346 awarded was not supported by judicial analysis and specific findings. (AOB 33:6 to 34:4.) This is not the law, and the record itself refutes these contentions.

Parker submitted a 40-page time log that detailed all the time, from contemporaneous records, and supported it with declarations from the attorneys. Judge Novack says "*After carefully reviewing the fee application* and the

39

opposition thereto, the court believes that some reduction in the Application is warranted." (Order, 2:9-10.) The fact that Judge Novack deleted $69,544 worth of time, in several areas of work, and on grounds not advocated by BCOA, shows that the court did conduct a detailed review of the *entire* application, and made specific findings as to time he felt was not "reasonable" either as to hours spent or the need for the work itself.

Fee awards under 362(k)(1) do not require every hour of the claim to be commented on by the judge. The rule is that a fee request supported by contemporaneous time records and declarations by the attorneys who did the work is presumptively adequate and awardable. The burden is on the challenger to prove otherwise. See *Orian v Asaf* (9th Cir. 2018), supra, holding that the court need not make detailed findings, and great deference is accorded to the trial court's "reasonableness" assessment. *Orian* contains an extended discussion of how much detail is required with a bankruptcy fee award in the Ninth Circuit. See also *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("concise but clear" discussion of basis for award is adequate) and *Gates v. Deukmejian*, 987 F.2d 1392, 1399-1400 (9th Cir. 1992) ("a brief explanation will do.").

As the trial judge who handled this case from inception in October 2014 to the post-trial fee awards in April 2019, Judge Novack is in a better position than anyone to evaluate the reasonableness of the fee request. He found that the

40

hours spent were reasonable given the intensity and length of the litigation. BCOA totally glosses over the fact that all this litigation was caused by their deliberate conduct and their obstinate refusal to acknowledge responsibility for violations of the law. BCOA attempts to dismiss this entire case as a "consumer stay relief motion," whatever that means, and not worthy of much litigation. (AOB 32:18, 33:1, 36:20.)

An award of attorney's fees under 362(k)(1) is reviewed for "abuse of discretion." *Eskanos & Adler LLC v. Roman (In re Roman)*, 283 BR 1, 7 (9th Cir. BAP 2002); *In re Schwartz-Tallard*, 803 F.3d 1095, 1101 (9th Cir. 2015). The findings of fact underlying the award are reviewed for "clear error." An award of fees and costs under 362(k)(1) will be upheld "unless it is clearly unsupported by the evidence or grossly excessive, monstrous, or shocking to the conscience." *In re Roman*, supra, 11. BCOA fails to meet this standard. No error is shown.

### 2. BCOA's accusation regarding "nonconpensable work" is patently refuted by the record.

BCOA falsely asserts the bankruptcy court "awarded substantial fees for non-compensable work, including Fong's fees incurred to prove contempt." (AOB 12:19-20; 34:6-25.) The court did no such thing. Parker did not seek such fees, and the court did not award such fees.

41

BCOA does not point to a single example of time spent on the discharge violation claim that was awarded by the court. Because the January 29, 2019 Decision did not find discharge violations, Parker's counsel removed several hundred hours for "discharge" work from the time records before submitting the fee application. (Marlene Fong declaration, ECF Doc. #305, Paragraph 6.) Likewise, BCOA's statement that "at trial, the parties almost exclusively litigated contempt, not section 362(k) claims" (AOB 34:14-15) is not supported by any reference to the trial transcript or the evidence. In fact nearly all the documentary evidence relates to the stay violations, which occurred before the discharge order of December 1, 2015. Parker's post-trial brief is largely devoted to how the evidence proved the many stay violations. (ECF doc. #297 6:1 to 24:25.)

Nor does BCOA point to a single example in the record of time awarded by the court for "stay violation contempt" work. The burden is on appellants to show error, not on this court to hunt for it.

BCOA's opposition to the fee application is a mere six pages long and does not point to any time in the fee application supposedly arising from work not connected to the stay violation. (ECF Doc. #307.) It was incumbent on BCOA to make and support its argument in the trial court, not for the first time on appeal.

BCOA argues that litigation of appellants' "intent" was not compensable, as "intent" is not relevant to stay violation. BCOA urges that virtually the entire case, including discovery, trial preparation, and the trial itself, was devoted to proving "intent." (AOB 34:11-25.) Once again, BCOA does not point to where in the record this contention is supported and the record itself refutes the contention. No error is shown.

In any event, this argument is mooted by the Supreme Court's decision in *Taggart v. Lorenzen*, 587 U.S. ____, 139 S.Ct. 1795 (2019), discussed in Part Two below, which mandates reversal of the bankruptcy court's denial of Parker's discharge violation claims. This court need not address BCOA's argument on this point.

### 3.  The court correctly found that BCOA did not prove its affirmative defense of "inadequate attempts to mitigate damages."

Judge Novack addressed the "mitigation" argument in his April 11, 2019 order awarding fees, citing *In re Roman*, 238 B.R. 1, 12 (9th Cir. BAP 2002): "One way to determine whether a debtor has complied with her duty to mitigate is to consider who caused the attorney's fees to be incurred – the debtor or her creditors." (April 11, 2019 Order 2:6-8.) The entire record of this case shows it was BCOA and its agents who caused all the attorney time incurred. BCOA glosses over this fact entirely. BCOA does not point to any time awarded by the court that was not due to conduct by BCOA and its scorched-earth litigation

43

strategy. The court denied the fee request for work the court believed was not necessary or was not in response to conduct by BCOA, such as Parker's objection to the Proof of Claim and the motion in support of the objection.

BCOA's assertion (AOB 35:3-4) that Judge Novack "did not weigh Parker's failure to mitigate damages in awarding fees" is directly contradicted by the court's discussion of the mitigation issue (April 11, 2019 Order 2:4-8; Dec. 19:5-21) and its finding that BCOA did not carry its burden of proving this affirmative defense: "BCOA never established, however, what course of conduct Parker should have pursued, and failed to demonstrate that it would have been amenable to her ameliatory efforts." (Dec. 19:13-14.) The March 25, 2019 declaration of Marc Fong in support of the fee application discusses the sheer impossibility of dealing with Jennings and BCOA, and Jennings' commandment that BCOA's attorney ignore all communications from Parker and her attorneys. (ECF Doc. #310, paragraphs 1-7.) Judge Novack presumably read the declaration and knew the history of futile attempts to deal with Jennings and BCOA.

Judge Novack made findings of fact and concluded BCOA did not prove its affirmative defense. An award of fees and costs under 362(k)(1) will be upheld "unless it is clearly unsupported by the evidence or grossly excessive, monstrous, or shocking to the conscience." *In re Roman*, supra, 11. BCOA does

44

not show how and why Judge Novack's findings and the award meet that near-insurmountable standard.

### 4. The discharge order eliminated the underlying assessment obligation and with it the lien. No law requires a debtor to warn a creditor to stop violating the stay.

BCOA contends that Parker's Chapter 13 plan required her to quitclaim the property to BCOA, and further that Parker should have alerted BCOA that Parker regarded its conduct as violating the stay. (AOB 35:17-22.) BCOA is wrong. The plan proposes to deal with BCOA's pre-filing claims by offering to let BCOA foreclose on the property, nothing more. Parker did in fact offer to quitclaim her unit to BCOA on October 29, 2014 but was ignored by BCOA. (Dec. 19:14-19; Exhibit X.) BCOA took no action to exercise its power to foreclose immediately, nor did it move to foreclose after getting redundant relief from stay. (Dec. 5:6-16; 19:14-19.)

By December 15, 2015 when BCOA belatedly raised the idea of a quitclaim the case was over and closed, the plan had been fully performed, the discharge had issued, and Parker was not obligated to do anything in connection with the plan. (AOB 35:20-21.) Pre-petition debts are subject to the discharge injunction so long as they are "provided for" in the Chapter 13 plan. *Ellett v. Stanislaus*, 506 F.3d 774, 777 (9th Cir, 2007). Parker's plan provides for all secured and unsecured claims of BCOA. Since the underlying debt ceased to

exist on December 1, 2015, so did the lien securing the debt. *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1235 (1995); *In re Martin*, 491 B.R. 122, 126-30 (Bankr. E.D. Cal. 2013).

BCOA does not point to any law that places an obligation on a debtor to alert a stay violator that its conduct violates the stay; it is up to the creditor to know the law and to regulate its behavior so as not to violate the stay. *In re Roman*, supra at 12-13. In any case Judge Novack found that there is no evidence that BCOA would have changed its conduct (Dec. 19:13-19), and the evidence (including Marc Fong declaration, ECF doc. #310, 1:24 to 3:13) is to the contrary.

BCOA's assertion (AOB 36:3-6) that if Parker had complained about stay violations "Appellants would have assured [Parker] that they were not attempting to collect any debt from Parker personally" is pure speculation and not part of the evidentiary record. The same is true of BCOA's assertion that "A call to Appellants would have alleviated her concern that Appellants intended to collect personally." (AOB 36:8-9.) This line of argument also ignores BCOA's seizure of Unit 990 in May 2015, the amendments to the CC&Rs to supposedly authorize such conduct while crediting nothing to any claim the HOA had against Parker, and BCOA's admission that the seizure and rental was to collect pre-filing claims. (Ex. BZ "50 Accomplishments" paras 41, 44.) The content of the documents in evidence (especially Ex M/35 and BZ) supports the finding

that BCOA would not be deterred from collecting from Parker, as does Exhibit

W where BCOA explicitly says it is "undeterred in its collections efforts by a

member's decision to file bankruptcy." (Ex W, March 10, 2015 Board minutes.)

### 5.  BCOA caused all the fees incurred in this case by its own unlawful and reprehensible conduct.

BCOA argues that Parker's fee request and the court's award is simply

too large to be "reasonable" under any circumstances in a "strict liability stay

violation" case. (AOB 37:13.) But as Judge Novack says in the order awarding

fees, "This case is unlike the typical stay violation contested matter where the

violations consist of the same act carried out multiple times. Here, the violations

included post-petition demands to settle pre-petition litigation, collection of pre-

petition HOA fees, imposition of HOA fines for pre-petition violations, and the

rental of Unit 990." (Order, ECF doc. #315, 3:14-18.)

BCOA ignores the fact that this case spanned three years of intense

litigation, arising from dozens of distinct stay violations and discharge

violations by BCOA, all of which was made necessary by BCOA's obstinate

refusal to acknowledge any wrongdoing. BCOA could have stopped this case

dead in its tracks in November 2015 by acknowledging the truth of the

allegations in the stay violation motion, ceasing the violations, and refunding

the "rent" seized by BCOA to Parker. Indeed, BCOA was required to do so.

*Snowden,* 769 F.3d at 659. It could also have stopped this becoming a "case" in

47

the first place by accepting Parker's offer to convey title in October 2014, or by acting on BCOA's right to initiate foreclosure proceedings based on its lien and Parker's surrender of the property in her plan.

Instead, BCOA responded by denying the reality of the violations, forcing Parker to litigate to protect herself and vindicate her rights. BCOA filed a mostly unsuccessful summary judgment motion in June 2017 that added scores of hours of work for Parker's attorneys. BCOA stonewalled discovery, forcing discovery fights. Multiple depositions were taken by both sides. BCOA refused to participate in any meaningful way in the July 2016 settlement process it had demanded. BCOA brought multiple motions in limine that had to be responded to. Finally, BCOA forced a trial, in which BCOA put on a very weak showing and ultimately lost on the merits on nearly every claim of stay violation.

During all this time, until the Ninth Circuit released its *Goudelock* decision mid-trial, Parker remained subject to a civil suit by BCOA to enforce its supposed "post-petition" assessment claims in excess of $84,000 plus all the supposed attorney's fees claimed by BCOA, likely hundreds of thousands of dollars. Litigating in the bankruptcy court was the only practical way to stop these claims, by proving them void as stay violations and discharge violations.

BCOA's position also ignores the rule that in determining "reasonable" fees in a 362(k) case it is imperative "to consider who caused the attorney's fees

to be incurred – the debtor or her creditors." *In re Roman*, supra at 12-13. There is no question as to who caused the fees to be incurred: BCOA.

By adding 362(k) Congress intended "to encourage injured debtors to bring suit to vindicate their statutory right to the automatic stay's protection, one of the most important rights afforded to debtors in the Bankruptcy Code." *In re Schwartz-Tallard*, 803 F.3d 1095, 1100 (9th Cir. 2015); *Sundquist*, supra at 588. Nothing in the Code indicates an intent to limit the attorney fees to whatever the violating creditor thinks is appropriate.

The cases cited by BCOA are specific to their own facts, and none is remotely close to this case in terms of complexity and issues presented. The Ninth Circuit cases cited, *Roman* and *Schwartz-Tallard*, strongly support the fees award in this case. *In re Manoa Fin. Co. Inc*, 853 F.2d 687 (9th Cir. 1988), endorses a $100,000 bonus in a Chapter 11 case on top of $140,000 in hourly fees, clearly supportive of this case, plus does not involve the *mandatory* fees of Section 362(k)(1) but rather *discretionary* fees. BCOA cites no law that would allow a trial judge, or a reviewing court, to reduce a fully documented fee application under 362(k)(1) to some arbitrary amount unrelated to the hours worked. No such law exists.

No error is shown. This court should affirm the findings of the bankruptcy court.

# PART TWO: OPENING BRIEF ON CROSS APPEAL
# I. ISSUES ON CROSS APPEAL

1. Did the court apply the wrong law to Parker's stay violation damages, by cutting off accrual of damages as of the date of discharge despite the continuing impact of the violations, and where the violator continues to this day to deny and litigate whether it violated the stay, and where no restitution has been made?

2. Did the court apply the wrong law to Parker's contempt claims arising from discharge and stay violations, in light of the Supreme Court's decision in *Taggart v. Lorenzen*?

# II. INTRODUCTION AND SUMMARY OF ARGUMENT

The court applied the wrong law to the stay violation damages, incorrectly ruling that the damages end when the discharge issues, in contravention of established law. Under Ninth Circuit law stay violation damages continue to accrue for as long as the violation causes harm. Further, the violation does not *ever* end if the violator continues to dispute it violated the stay, as in this case. This per se abuse of discretion mandates reversal and remand.

Second, the court applied the wrong law to Parker's discharge violation claims. Relying on the holding of *Lorenzen v. Taggart*, 888 F.3d 438, 443 (9th

50

Cir. 2018)   ("*Lorenzen*") that "a creditor's good faith belief that the discharge injunction does not apply to the creditor's claim precludes a finding of contempt, even if the creditor's belief is unreasonable," the bankruptcy court ruled that BCOA had a "good faith belief" that the injunction did not apply to its claims and that this subjective belief immunized it from contempt claims. (Decision 25:21 – 27:19.)

The Supreme Court reversed the Ninth Circuit *Lorenzen v. Taggart* decision and adopted the "fair ground of doubt" standard for proving discharge violations: "Under the fair ground of doubt standard, civil contempt … may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1802 (2019) ("*Taggart*"). The "proper standard" is thus "an objective one." This ruling too was a per se abuse of discretion, requiring reversal and remand.

# III. ARGUMENT

## A. THE COURT APPLIED THE WRONG LAW TO PARKER'S STAY VIOLATION CLAIM AS TO POST-DISCHARGE ACCRUAL OF DAMAGES.

### 1. The bankruptcy court erred by cutting off damages for the stay violations at the date of the discharge, in contravention of established law.

BCOA seized and rented out Parker's condominium on May 19, 2015, entering into a "lease" with a one-year initial term at $6,500 per month, running until June 14, 2016. The lease was extended after June 2016, until mortgage lender Deutsche Bank took title by foreclosure in December 2016. (Dec. 9:7-10.) The court found the lease to be a stay violation, void ab initio. (Dec. 20:5-10.) Specifically, the lease violated 362(a)(6) as an act to collect a claim that arose before the commencement of the case. (Dec. 22:18.)

The court awarded damages for the stay violation at $6,500 per month, the rental value of the property. (Dec. 20:10-19.) However, the court cut off damages for this stay violation as of the *date of the discharge*, December 1, 2015, allowing only the $39,000 taken by BCOA as of that date. (Dec. 20:18-19.) The court did not explain the basis for its implied ruling that stay violation damages cease accruing when the discharge issues. This ruling was error.

"Cognizable effects of a violation may linger after the formal expiration of the stay. For example, the stay with respect to an individual debtor expires upon entry of discharge or dismissal of the case. 11 U.S.C. 362(c)(2).

Nevertheless, consequences directly attributable to the violation of the stay before its expiration may continue to be visited upon a debtor for an additional period of time." *Sundquist*, supra, 586, citing *Snowden v. Check into Cash of Wash. Inc.* (*In re Snowden*), 769 F.3d 651, 659 and 662 (9th Cir. 2014). The *Sundquist* court said, "The stay violations being undeniable, the key questions of law are whether, and for how long, 'actual damages' under 362(k)(1) continue to accrue after the automatic stay expires? The answer has two facets. First, damages continue to accrue until full restitution is made. Second, applicable tort concepts teach that damages encompass all consequences proximately caused by the stay-offending conduct for so long as those consequences continue, regardless of whether the stay has expired." *Sundquist*, 571. The *Snowden* court had reached the same result: The stay violation only ended "when the bankruptcy court ordered the return of Snowden's wrongfully seized property." *Snowden*, 662. The *Sundquist* court awarded actual damages of $1,074,581.50 and punitive damages of $45,000,000.00. *Sundquist*, 593-4, 620.

"When, as here, a violation of the discharge injunction is merely continuation of pre-discharge conduct that violated the automatic stay, Sec. 362(k)(1) continues to provide stronger, more explicit, and more definite statutory remedies that are more adequate to the task than the least-possible-exercise-of-power restriction on civil contempt." *In re LeGrand*, __ B.R. __, 14

53

(Bankr. E.D. Cal. Feb. 6, 2020). The 362(k)(1) remedies remain effective post-discharge "until the stay violation is purged by actual restitution." *Id*., citing *Snowden,* 659, 662. In *LeGrand* a creditor violated the stay by garnishing wages during the case, and then collected several more installments post-discharge, essentially identical to the present case. The court imposed $25,000 in punitive damages under 362(k)(1) for the post-discharge stay violations, in addition to compensatory damages.

In the present case the bankruptcy court erred by applying the wrong law, or a mistaken interpretation of the law, to Parker's claim for ongoing damages for violation of the stay. Those damages continued to accrue regardless of the termination of the stay. BCOA continued to collect rent under its void pre-discharge "lease" of Parker's property, collecting or recovering another $78,000 in pre-petition claims from December 1, 2015 through December 2016, as well as inflicting ongoing damages for emotional distress. This was not a new category of violation, but merely a continuation of the May 19, 2015 "lease" stay violation.

As in *Snowden* and *Sundquist*, BCOA continued to deny it had violated the stay, forcing a trial, and in this appeal continues to insist it never violated the stay. Thus the violation has not yet ended and continues to inflict harm on Parker by depriving her of the lost value of her property and other damages. Likewise, BCOA continues to refuse to make any restitution of the $39,000

taken before the expiration of the stay, as well as the $78,000 taken after the discharge, therefore the stay violation continues to run to this day. *Sundquist*, 586, citing *Snowden* at 659, 662.

The bankruptcy court indisputably applied the wrong law, a per se abuse of discretion, mandating reversal and remand. The error is highly prejudicial as it deprived Parker of a fair trial under the correct legal standard, deprived her of at least $78,000.00 in additional damages, and deprived her of the mandatory attorney fees incurred in seeking those further damages under 362(k)(1).

## B. THE COURT APPLIED THE WRONG LAW TO PARKER'S CONTEMPT CLAIMS

### 1. The bankruptcy court erred by applying the wrong law to Parker's contempt claims arising from the discharge violations and stay violations, a per se abuse of discretion that mandates reversal and remand.

Relying on the Ninth Circuit's holding in *Lorenzen*, the bankruptcy court denied Parker's contempt claim as to the rent collected for the year following the discharge, $78,000. "First, Parker did not introduce clear and convincing evidence establishing how BCOA applied these funds. As stated above, respondents had a good faith belief that Parker was liable for the post-petition HOA assessments. Absent clear and convincing evidence regarding how BCOA used these funds, the court is not willing to hold it in contempt." (Dec. 27:4-8.)

The court also denied the contempt claim for the "retro" assessments and the post-petition assessments on the grounds that "respondents testified that they did not believe that the 2015 HOA assessment was subject to the stay. Such testimony demonstrates that they had a good faith belief that the 2015 HOA assessment (in the amount of $22,558.20) was not discharged." (Dec. 26:20-22.) "This court finds that Parker did not introduce clear and convincing evidence establishing that respondents knew the true scope of the discharge and understood that it applied to all of the amounts listed in the April 2nd invoice." (Dec. 26:25-27:1.)

The Supreme Court overruled the Ninth Circuit *Lorenzen* decision in *Taggart v. Lorenzen*, 587 U.S. ___ ; 139 S.Ct. 1795 (2019). In *Taggart* the Court adopted the reasoning of *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 618 (1885), to find that "a court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct. In other words, civil contempt may be appropriate if there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." *Taggart*, 139 S.Ct. at 1799; emphasis original. "Under the fair ground of doubt standard, civil contempt may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id.*

The Supreme Court said, "As for the Ninth Circuit, the parties and the Solicitor General agree that it adopted the wrong standard. So do we. The Ninth Circuit concluded that a 'creditor's good faith belief' that the discharge order 'does not apply to the creditor's claim precludes a finding of contempt, even if the creditor's belief is unreasonable.' 888 F.3d, at 444. But this standard is inconsistent with traditional civil contempt principles, under which parties cannot be insulated from a finding of civil contempt based on their subjective good faith. It also relies too heavily on difficult-to-prove states of mind. And it may too often lead creditors who stand on shaky legal ground to collect discharged claims, forcing debtors back into litigation (with its accompanying costs) to protect the discharge that it was the very purpose of the bankruptcy proceedings to provide." *Taggart*, 139 S.Ct. at 1803.

The Ninth Circuit BAP recently decided a post-*Taggart* case involving essentially the same situation as the present case, *In re Freeman*, 609 B.R. 228 (9th Cir. BAP, November 5, 2019). Like in this case, the bankruptcy court had applied the then-binding Ninth Circuit "subjective good faith belief, even if unreasonable" standard to a discharge violation contempt claim. The BAP applied the new Supreme Court standard to the appeal from the bankruptcy court: "The Supreme Court, however, changed the metrics of decision after the bankruptcy court ruled. It determined that a bankruptcy court may 'impose civil contempt sanctions when there is no objectively reasonable basis for concluding

that the creditor's conduct might be lawful under the discharge order.' [*Taggart*] at 1801. This standard is 'generally' an objective one." *In re Freeman*, supra. "Given the change in controlling law, we must vacate the decision and remand for a decision under the standard now required by the Supreme Court." *Id.*

In light of *Taggart*, the bankruptcy court indisputably applied the wrong law to the facts. This court reviews the decisions of the bankruptcy court de novo as to whether the lower court applied the correct law. Application of the wrong law is per se abuse of discretion and mandates reversal. *U.S. v. Hinkson*, supra, 1262.

### 2.  Parker will likely prevail on remand, and thus reversal is appropriate.

The trial evidence proved beyond any question that BCOA's acts were intended to collect claims that existed prior to commencement of the case, and the court so ruled. Referring to Exhibit BZ, the court said "In a June 2, 2015 email to BCOA's members, Jennings crowed about the 990 lease, which allowed BCOA to 'recapture … costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history.'" (Dec. 17:1-3.) In almost identical language the court said about leasing 990, "Jennings hailed this accomplishment *as enabling the 'recapture of all costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history*.' Jennings' testimony did not dispute the plain import of his statement." (Dec. 9:12-16;

58

italics added.) BCOA's June 5, 2015 "potent plan" memo (Ex. AA) extolling the brilliance of the scheme to rent Parker's unit, likewise refers to the intent to "recover from the long-term economic damage inflicted by 990's delinquent owner," another admission that BCOA was determined to collect the discharged pre-filing claims. (Dec. 8:2-9.)

Under *Taggart* civil contempt may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order *or the statutes that govern its scope*. *Taggart,* 139 S.Ct at 1796. This includes an understanding of sections 362(a), 524(a), and 1328(a) and their application.

Here, the findings by the court and the evidence at trial shows there was "no objectively reasonable basis for concluding" that BCOA's conduct might be lawful. No reasonable person with the facts and law available could possibly conclude that continuing to rent out 990 and seize the rental income to offset pre-petition claims was lawful.

In general, the law presumes that all parties are aware of the obligations the law imposes on them. *Bibeau v. Pac. Nw. Research Fund, Inc*., 188 F.3d 1105, 1110 (9th Cir. 1999), *opinion amended on denial of reh'g*, 208 F.3d 831 (9th Cir. 2000). In particular, "businesses are deemed knowledgeable of the laws affecting their enterprise." *Franken Invs. Inc. v. City of Flint*, 218 F. Supp. 2d 876, 886 (E.D.Mich. 2002) (citing *Federal Crop Ins. Corp. v. Merrill*, 332 U.S.

59

380, 384, 68 S.Ct. 1 (1947)). BCOA is in the business of collecting assessments from its members, some of whom inevitably will declare bankruptcy. Therefore, it must be familiar with, and *comply* with, the federal laws regarding debt and bankruptcy.

Given the facts and applicable law Parker is highly likely to prevail on remand, thus it is appropriate to return the case to the bankruptcy court for further proceedings.

### 3.  Parker was deprived of a fair trial as to the $78,000 in "rent" seized by BCOA post-discharge.

Parker's contempt claim arises from BCOA's relentless pursuit of the pre-petition assessments that BCOA was unwilling to "lose" to bankruptcy law. BCOA never, to this day, has given up trying to collect as much of its $162,000 pre-filing claim as possible. It nearly succeeded, collecting over $128,000 from seizing and renting Parker's condominium from May 2015 through December 2016. BCOA did not stop when the discharge issued but continued collecting "rent" at $6,500 per month. None of the "rent" was applied to Parker's assessment account or any other potential claim BCOA may have had against Parker. (Dec. 8:2-17.) BCOA continues to assert that it is entitled to keep the $78,000 it collected after the discharge. (AOB pgs 15-18.)

At the very least, the court's error of law deprived Parker of a fair trial on the merits. Parker had no chance to introduce evidence or argue during or after

trial that no objective reasonable person could have a fair ground of doubt as to whether BCOA's conduct violated the discharge order. This is not a theoretical matter, as the court deprived Parker of her right to recover the $78,000 in rental value taken –   and kept to this day – by BCOA. Parker is also entitled to claim continuing emotional distress under Section 105(a), along with further punitive damages. The court's error of law is highly prejudicial and requires reversal.

### 4. The court erred by applying the wrong law to the contempt inherent in the stay violations.

The court applied the same "good faith belief, even if unreasonable" standard to Parker's claims that the stay violations also constituted contempt, ruling that Parker had not disproved BCOA's mental state as to those violations. (Dec. 27:9-19; pg. 27 fn. 25.) BCOA's subjective "belief" as to whether its conduct violated the stay is no longer relevant under the *Taggart* objective standard. Under that standard, BCOA can only avoid a finding of contempt if it proves that an objective reasonable person, aware of the facts and the statutes regulating bankruptcy, could have possessed a "fair ground of doubt" as to whether the automatic stay applied to the conduct at issue. Here, no reasonable objective person could possibly have believed that collecting pre-petition claims (both those billed to Parker pre-petition and those deemed pre-petition under *Goudelock*) did not violate the automatic stay. See *In re LeGrand*, supra (*Taggart* objective standard applies to stay violations).

61

This is a pure error of law, mandating reversal and remand to determine damages under the correct law and, if necessary, determine any additional facts. The error is highly prejudicial as it deprived Parker of a fair trial and the opportunity to recover damages for those acts of contempt.

## IV. CONCLUSION

Appellants fail to show that the bankruptcy court erred in any way or abused its discretion in finding that appellants repeatedly violated the automatic stay. The court's findings of fact and law should be affirmed as to the stay violations and damages awarded.

However, the court applied the wrong law to the stay violation damages, improperly limiting the damages to only the time before the discharge. The error is highly prejudicial and requires remand to allow Parker a fair trial under the correct law.

While the bankruptcy court was duty bound to apply the then-current "subjective" standard to Parker's discharge violation claims, the subsequent clarification of the law in *Taggart* establishes that the court applied the wrong law, mandating reversal and remand for consideration of damages under the objective "fair ground of doubt" standard.

This court should reverse the bankruptcy court and remand the case for further proceedings on the issues addressed in the Cross Appeal.

Dated this 6th of March 2020.

_/s/ Marlene A. Fong_                          _/s/ Christina L Henry_
Marlene A. Fong SBN 111560           Christina L Henry, WSBA # 31273
FONG & FONG APC                         Appearing Pro Hac Vice
2161 Harbor Bay Parkway               Henry & DeGraaff, PS
Alameda, CA 94502                         787 Maynard Ave S
Tel. 510-748-6800 x 107                  Seattle, WA 98104
_mfong@fonglaw.com_                    Tel# 206-330-0595
                                                     Fax# 206-400-7609
                                                     _chenry@hdm-legal.com_

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B)(i). As reported by Microsoft Word for Office 365, it contains 14,524 words, excluding the portions exempted by Fed. R. Bankr. P. 8015(g).

This brief complies with the typeface requirements of Fed. R. Bankr. P. 32(a)(5)(A). The body of the brief is set in 14 pt. Times New Roman.

Dated this 6th March 2020.

*/s/ Christina L Henry*
Christina L Henry, WSBA # 31273
Appearing Pro Hac Vice
Henry & DeGraaff, PS
787 Maynard Ave S
Seattle, WA 98104
Tel# 206-330-0595
Fax# 206-400-7609
*chenry@hdm-legal.com*