**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE: SARAH-JANE PARKER,**<br><br>Debtor. | Case No.: 19-cv-2588-YGR<br>(*appeal from* 4:14-BK-44083-CN)<br><br>**ORDER AFFIRMING IN PART AND VACATING AND REMANDING IN PART BANKRUPTCY COURT'S JUDGMENT** |

Presently before the Court are: (1) the appeal of Bayside Court Owners Association, Inc. ("BCOA"), Laurence Jennings, Raj Patel, Justin Hu, Lawrence Drouin, and Andrew Cantor (collectively, "Respondents") from the judgment entered April 11, 2019 by the bankruptcy court; and (2) the cross-appeal of debtor Sarah-jane Parker. The Court has jurisdiction over this appeal of a final order of the bankruptcy court. 28 U.S.C. § 158(a)(1).

Having carefully considered the papers submitted and the bankruptcy court record, and for the reasons detailed herein:

On the appeal of Respondents, the Court **AFFIRMS** the decision of the bankruptcy court with respect to all issues raised.

On the cross-appeal of Parker, the Court **VACATES AND REMANDS** for further findings applying standard from the United States Supreme Court's decision in *Taggart* on the contempt claims, and for further findings on that portion of the stay violation damages which continued post-discharge.

1

United States District Court
Northern District of California

## SUMMARY OF BANKRUPTCY COURT DECISIONS AT ISSUE

The appeals herein are rooted in a long, contentious dispute between the parties culminating in a multi-day trial on Parkers' allegations that Respondents engaged in violations of the automatic stay and discharge injunction and acted in contempt of the bankruptcy court's orders. On January 29, 2019, the bankruptcy court issued a 29-page Memorandum Decision After Trial (BKDkt. No.[1] 299, "Mem. Dec.") and on April 11, 2019, an Order Awarding Attorneys' Fees and Costs to Parker (BKDkt. No. 315)[2]. Portions of both decisions are appealed. Core to many of the ongoing disputes is the classification of certain of the BCOA's assessments.

In its Memorandum Decision After Trial, the bankruptcy court found that Parker had proved BCOA, and some of the individual Respondents, engaged in multiple violations of the stay. (BKDkt. No. 299, Memorandum Decision After Trial ["Mem. Dec."].) The bankruptcy court awarded Parker $5,000.00 in emotional distress damages, $39,000.00 in property right interference damages, and $10,000 in punitive damages on account of those violations. The bankruptcy court found two individual BCOA board members, Secretary/Treasurer Laurence Jennings and President Raj Patel, to be jointly and severally liable as to the $39,000.00 in property interference damages. However, the bankruptcy court found that Respondents should not be held in contempt under Bankruptcy Code 105 for repeated stay violations or under Bankruptcy Code 524(a)(2) for violation of the discharge injunction, applying the "good faith belief" standard stated by the Ninth Circuit in *Lorenzen v. Taggart (In re Taggart),* 888 F.3d 438, 444 (9th Cir. 2018). (*Id*. at 25.)

Upon application for attorneys' fees and costs, the bankruptcy court further ordered attorneys' fees of $369,346.90 and costs of $9,770.05 to be paid to Parker by BCOA. (BKDkt. No. 315.)

---

[1] All record citations herein, other than the exhibits admitted at trial, refer to their docket numbers in bankruptcy court's docket for this matter, *In re: Sarah-jane Parker*, Northern Dist. Bankruptcy Case No. 14-44083-CN as "BKDkt. No. __."

[2] On April 11, 2019, judgment was entered against the Association in the amount of $433,116.95, with individual respondents Laurence Jennings and Raj Patel jointly and severally for $39,000.00 of the total award. (BKDkt. No. 316.)

United States District Court
Northern District of California

**APPLICABLE STANDARDS OF REVIEW**

District courts have jurisdiction over appeals "from final judgments, orders, and decrees" entered by bankruptcy courts. 28 U.S.C. § 158(a)(1); *Wei Suen v. Demas Wai Yan (In re Demas Wai Yan)*, 381 B.R. 747, 752 (N.D. Cal. 2007). The district court reviews the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *Preblich v. Battley*, 181 F.3d 1048, 1051 (9th Cir. 1999). Findings of fact are clearly erroneous when the reviewing court "is left with a definite and firm conviction that a mistake has been committed." *In re Roman*, 283 B.R. 1 (B.A.P. 9th Cir. 2002).

Whether the automatic stay provisions of 11 U.S.C. § 362(a) have been violated is a question of law reviewed de novo. *Eskanos & Adler, P.C. v. Leetien (In re Leetien)*, 309 F.3d 1210, 1213 (9th Cir. 2002). "Whether a party has *willfully* violated the automatic stay is a question of fact reviewed for clear error." *Id.* (citing Fed. R. Bankr.P. 8013 and *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165, 167 (9th Cir. BAP 1995)) (emphasis supplied). The amount of any sanctions imposed for a willful violation of the automatic stay is reviewed for an abuse of discretion. *In re Leetien*, 309 F.3d at 1213 (citing *Franchise Tax Board v. Roberts (In re Roberts)*, 175 B.R. 339, 343 (9th Cir. BAP 1994)).

**LEGAL FRAMEWORK**

Parker filed for bankruptcy under Chapter 13. "A Chapter 13 discharge is intended to be a 'discharge of all debts,' barring a few enumerated exceptions." *Goudelock v. Sixty-01 Ass'n of Apartment Owners*, 895 F.3d 633, 637 (9th Cir. 2018) (citing 11 U.S.C. § 1328(a)). "A discharge under Chapter 13 'is broader than the discharge received in any other chapter' of the Bankruptcy Code." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 268 (2010). Bankruptcy proceedings are intended to grant debtors a 'fresh start.'" *Id.* (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). Consequently, the Bankruptcy Code "is to be construed liberally in favor of debtors." *Id.* (quoting *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985)).

"[O]nly debts arising pre-petition may be discharged" and, for purposes of bankruptcy law, federal law governs when a claim is deemed to arise, *i.e.* whether it arose pre-petition or post-petition. *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009). The Bankruptcy Code defines a

"debt" as a "liability on a claim." 11 U.S.C § 101(12). A "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Thus, the Bankruptcy Code defines "claim" expansively to encompass even remote or contingent obligations. *See SNTL*, 571 F.3d at 838. Under the longstanding "fair contemplation" test in the Ninth Circuit, "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence" even if a cause of action would not have accrued under non-bankruptcy law on the claim. *Goudelock*, 895 F.3d at 638 (citing *SNTL*, 571 F.3d at 839).

Section 362 of the Bankruptcy Code describes the automatic stay in bankruptcy. 11 U.S.C. § 362. The filing of a bankruptcy petition acts as an automatic stay of a variety of actions. "The scope of protections embodied in the automatic stay is quite broad, and serves as one of the most important protections in bankruptcy law." *In re Leetien*, 309 F.3d at 1214 (*citing Chugach Timber Corp. v. Northern Stevedoring & Handling Corp.,* 23 F.3d 241, 243 (9th Cir.1994)). The breadth of the automatic stay provisions is intended to ensure "all claims against a debtor be brought in a single forum, the bankruptcy court." *Id.* (citing *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 585 (9th Cir.1993)); *see also In re Zotow*, 432 B.R. 252, 261 (B.A.P. 9th Cir. 2010) ("Generally, the injunction of § 362 serves to control creditor action by encouraging creditors to participate in the bankruptcy process to resolve their claims.").

Of import here, the automatic stay bars "any act to create, perfect or enforce any lien against property of the [bankruptcy] estate" under 11 U.S.C. section 362(a)(4). Under section 362(a)(5), the stay extends to "any act to create, perfect or enforce against property *of the debtor* any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(5) (emphasis supplied). Further, section 362(a)(6) provides that the stay prohibits "any act to collect, assess, or recover a claim *against the debtor* that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6) (emphasis supplied). Subject to certain specified exceptions stated in the statute, the automatic stay continues "until the earliest of [:] (A) the time the case is closed; (B) the time the case is dismissed; or (C) if the case [is under, *inter alia*, chapter 13], the time a discharge is granted or

denied." 11 U.S.C. § 362(c)(2).  In effect, a "discharge order 'operates as an injunction' that bars creditors from collecting any debt that has been discharged."  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1800 (2019) (citing 11 U.S.C. § 524(a)(2)).

With respect to violations of the automatic stay, section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k).  Willful conduct is demonstrated when the creditor knows of the automatic stay and the actions that violate the stay are intentional.  *In re Leetien,* 309 F.3d at 1215; *In re Peralta*, 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004).  "No specific intent is required; a good faith belief that the stay is not being violated 'is not relevant to whether the act was 'willful' or whether compensation must be awarded.'"  *In re Peralta*, 317 B.R. at 389 (quoting *Johnston Envt'l Corp. v. Knight (In re Goodman),* 991 F.2d 613, 618 (9th Cir.1993)).  Whether a creditor's action is permissible or prohibited under section 362(a) is a fact-driven inquiry.  *In re Zotow*, 432 B.R. at 259.

An "actual damages" award to individuals injured by a willful violation of the stay generally is mandatory. 11 USC § 362(k) (individuals injured by willful violation "*shall* recover actual damages") (emphasis supplied); *In re Ramirez*, 183 B.R. 583, 589 (B.A.P. 9th Cir. 1995) ("The words "shall recover" indicate that Congress intended that the award of actual damages, costs and attorney's fees be mandatory upon a finding of a willful violation of the stay.")  "Actual damages" for violation of the automatic stay include emotional distress damages.  *In re Snowden*, 769 F.3d 651, 656–57 (9th Cir. 2014).  "Section 362(k) permits an award of emotional distress damages if the bankruptcy petitioner '(1) suffer[s] significant harm, (2) clearly establish[es] the significant harm, and (3) demonstrate[s] a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process).'"  *Id.* (quoting *In re Dawson,* 390 F.3d 1139, 1149 (9th Cir. 2004).

Section 362(k) also provides for punitive damages "in appropriate circumstances."  11 U.S.C. § 362(k)(1).  An award of punitive damages requires "some showing of reckless or callous disregard for the law or rights of others."  *In re Snowden*, 769 F.3d at 657 (quoting *In re Bloom,*

United States District Court
Northern District of California

United States District Court
Northern District of California

1    875 F.2d 224, 228 (9th Cir.1989)).  Thus, punitive damages are "appropriate in the context of a

2    stay violation when there's a reckless and callous disregard for the law or the rights of others or

3    where the conduct is malicious, wanton, or oppressive." *Id.*

4         With respect to violations of a bankruptcy discharge order, the Bankruptcy Code provides

5    no specific remedy and courts instead consider such violations under the rubric of contempt.  *See*

6    *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002); *ZiLOG, Inc. v. Corning (In re*

7    *ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006).  A bankruptcy court may "impose civil

8    contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's

9    conduct might be lawful under the discharge order." *Taggart*, 139 S.Ct. at 1801.

10                           **SUMMARY OF FACTS**

11   **I.    BACKGROUND**

12        Bayside Court is a 33-unit condominium development in a former Oakland warehouse.

13   Sarah-jane Parker,[3] debtor and cross-appellant here, purchased Unit 990 at Bayside Court in 2005

14   ("the Property").  The Property, like all condominiums in the development, was subject to

15   Covenants, Conditions & Restrictions.  (Parker Trial Ex. B ["CC&Rs"].)  The CC&R's describe

16   the rights and obligations of Owners of Condominiums, mandate that "[r]egular assessments shall

17   be levied on a fiscal year basis," require each unit be kept "in good repair and condition," and

18   allow BCOA to make necessary repairs and assess the costs against applicable units and Owners.

19   (*Id.* §§ 6.2.1, 5.3, 5.4, 6.1.)[4]  At the time Parker acquired the Property, the CC&Rs provided that

20   annual assessments were to be calculated by a formula allocating certain expenses based upon unit

21   _____

22        [3]  Parker's correspondence in the record and communications with her counsel indicate that
     the correct punctuation of her first name is "Sarah-jane" and so the Court adopts that punctuation.

23        [4]  The CC&Rs provide that "[t]he obligation to pay assessments shall run with the land so
24   that each successive record Owner . . . shall in turn become liable to pay all such assessments."
     (CC&Rs § 6.1.1.)  They further provide that "[t]here is a present lien against each Condominium
25   to secure payment of all assessments (except reimbursement assessments) levied against the
     Condominium pursuant to the Declaration, all additional changes and all sums which become due
26   and payable in accordance with this Declaration after the date of recordation of a notice of
     assessment due." (CC&Rs § 6.6.1.)  Section 6.6.3 permits the Association to enforce assessment
27   obligations by filing suit against any Owner personally obligated to pay delinquent assessments,
     by commencing proceedings to foreclose a lien by recordation and service of a notice authorized
28   by the Board, or both. (CC&Rs § 6.6.3.)  The CC&Rs define "the Board" as the board of directors
     of the Association.

1    size and dividing others equally among all units.  (*Id.* § 6.2.3.)  With a change in the composition

2    of the BCOA's board in 2012, assessments were recalculated based entirely on unit size and

3    retroactive assessments based on these new calculations, changing Parker's annual assessment

4    from $7,000 to over $22,500.  (*See* Trial Exs. S, T.)

5         BCOA filed a civil suit against Parker in May 2013 to collect unpaid assessments.  Parker

6    cross-complained in that action, challenging the validity of the assessments and alleging breach of

7    fiduciary duty.[5]

8    **II.    THE BANKRUPTCY PROCEEDINGS**

9         On October 8, 2014, Parker filed her Chapter 13 bankruptcy petition.  (BKDkt. No. 1.)

10   Parker listed BCOA's claim for unpaid assessments on the petition's Amended Schedule D as a

11   disputed claim in the amount of $161,000.  (*Id.* at 13.)[6]  Parker's Bankruptcy Plan provided for

12   certain secured claims, including those of BCOA, the county tax assessor, a mortgage lender and a

13   loan servicer, to be satisfied by surrendering the Property, *i.e.*, modifying the automatic stay "to

14   allow a Class 3 secured claim holder to exercise its rights against its collateral," rather than

15   making cash payments.  (BKDkt. No. 45 at ¶ 2.06; *see also* ¶ 5 ["Surrender shall be in full

16   satisfaction of any secured claim by Bayside Court Owners Assn."].)  The Plan further provided

17   that "[p]roperty of the estate will revest in Debtor [*i.e.*, Parker] upon confirmation." (*Id.* at ¶ 4.01.)

18   "After the property revests in Debtor, Debtor may sell, refinance or execute a loan modification

19   regarding real or personal property without further order of the court with the approval of

20   Trustee." (*Id.*)  On December 17, 2014, the bankruptcy court confirmed Parker's Plan.  (BKDkt.

21   No. 50.)

22        On or about February 10, 2015, BCOA submitted a proof of claim in the bankruptcy

23   proceedings indicating it was owed $163,249.18 in "Unpaid Member Account Charges Pursuant

24   _____

25        [5]  By October 2014, Parker also had not paid her first mortgage for two years or any
     principal amount on her second mortgage.  (BKDkt. No. 259, Joint Pretrial Order, "Stipulated

26   Facts" at 2:4-5.)  The holder on the second deed of trust had schedule a trustee's sale for October
     8, 2014. (Stipulated Facts at 2:6.)

27        [6] Parker initially listed BCOA's claim as "unsecured" in the original petition. (BKDkt. No.
     1.)  However, by the time of filing of her Amended Plan, she categorized BCOA's claims as

28   secured by the collateral of the Property.  (*See* Amended Plan, BKDkt. No. 45 at 2.)

United States District Court
Northern District of California

1   to Property CC&Rs" and that the "basis for perfection" was "HOA Liens."  (*See* BKDkt. No. 168-

2   2 [attaching BCOA's Claim dated 2/6/2015].)  BCOA attached to the Proof of Claim a four-page

3   document dated February 9, 2015, which stated at the top of each of the pages "BCOA Late

4   Payment Demand & Notice of Delinquency" and listed multiple transaction line items for every

5   month from March 2013 to February 2015.  (BKDkt. No. 168-3.)[7]

6           On March 13, 2015, BCOA filed a motion for relief from the automatic stay requesting to

7   "vacate the automatic stay entered in this proceeding as it pertains to real Property . . . so that

8   BCOA's secured interest in and to the Property may be foreclosed or otherwise disposed of in any

9   manner permitted by the laws of the State of California."  (BKDkt. No. 53 at 2.)  The bankruptcy

10  court entered an order granting the motion without further discussion.  (BKDkt. No. 60.)

11          On November 3, 2015, Parker first filed her motion for sanctions for violation of the

12  automatic stay and for contempt.  (BKDkt. No. 71.)  Pursuant to the stipulation of the parties,

13  granted by the bankruptcy court on November 19, 2015, hearing on the alleged stay and discharge

14  violations was set for hearing in January of 2016.  (BKDkt. No. 77, 78.)

15          Approximately a year after the confirmation order, and with the sanctions issues still

16  pending, on December 1, 2015, the bankruptcy court issued its Order of Discharge under 11

17  U.S.C. section 1328(a).  (BKDkt. No. 80.)  In its standard form language, the discharge order

18  explains:

19          This order means that no one may make any attempt to collect a discharged debt
            from the debtors personally. . . . Creditors cannot contact the debtors by mail,
20          phone, or otherwise in any attempt to collect the debt personally.  Creditors who
            violate this order can be required to pay debtors damages and attorney's fees.
21          However, a creditor with a lien may enforce a claim against the debtors' property
            subject to that lien unless the lien was avoided or eliminated. For example, a
22          creditor may have the right to foreclose a home mortgage or repossess an
            automobile.
23

24          (*Id*.)

25

26  ─────────────────

27          [7]  The Proof of Claim filed by BCOA states: "Prior to the Petition Date, BCOA caused
    three (3) liens to be recorded against the Property."  (BKDkt. No. 168-3; *see also* BKDkt. No. 53
28  [BCOA's Motion for Relief from Stay] at 2:26.)  However, the appellate record does not include
    evidence of *recorded* liens against the Property by BCOA.

United States District Court
Northern District of California

8

III.   **PARKER'S ASSERTED STAY AND DISCHARGE VIOLATIONS**

Parker's motion for stay and discharge violations identified several categories of conduct by Respondents, six of which are relevant here.  The facts are summarized below.

A.   **Asserted Violations of the Automatic Stay**

1.   *Late Payment Demands*

On December 2, 2014, fifteen days before the bankruptcy court confirmed Parker's plan on December 17, BCOA sent Parker a "Late Payment Demand & Notice of Delinquency" ("December Late Payment Demand").  (Trial Ex. F; BKDkt. No. 290 ["Trial TR"] at 601:9-10, 602:20-23.)  The December Late Payment Demand included assessments, finance charges, and late fees dating from September 20, 2012 to December 2, 2014.  (*Id*.)  The December Late Payment Demand listed $169,669.88 due to BCOA for annual assessments, late fees, and interest, including $159,656.42 that was past due over 90 days. (*Id*.)  The Late Payment Demand attached to an email to Parker, the text of which is repeated, in part: "Your Association Member's account is past due!  Your Late Payment Demand Statement is attached accordingly."  (*Id*.)  It further stated that, because the account was delinquent, the CC&Rs enabled BCOA to "sell a member's property to the highest bidder in order to satisfy the lien" and "it is very important that you provide full payment to avoid the foregoing enforcement activities from affecting your account and your Association property."  (*Id*.)  The Late Payment Demands also included instructions for mailing of payments to BCOA's bank account. (*Id*.)

On or about January 3, 2015, BCOA sent Parker another, nearly identical "Late Payment Demand & Notice of Delinquency." (Trial Ex. H ["January Late Payment Demand"].) The invoice added line items for $22,558.00, constituting accelerated assessments for all of 2015 plus late fees and finance charges incurred as of January 1, 2015.  (*Id*.)  The January Late Payment Demand listed $196,256.71 due to BCOA, including $162,928.18 that was past due over 90 days. (*Id*.)  The Late Payment Demand contained the same warnings about enforcement actions and payment instructions.  The Late Payment Demand again was sent as an email attachment with the same text from December, *i.e.* "Your Association Member's account is past due!  Your Late Payment Demand Statement is attached accordingly," and warnings about enforcement actions.  (*Id*.)

### 2.      *Disciplinary Fines*

From December 1, 2014 through March 30, 2015, Bayside imposed 22 separate fines for "violation of rules" under the CC&Rs.  On December 1, 2014 and March 1, 2015, BCOA sent Parker "BCOA Member Account Invoices" which imposed $5,000 in fines for asserted violations of the CC&R provisions, including failures (i) to pay property taxes, assessments, and city taxes; (ii) to advise of tenant identity, "acting in a manner which generally reduces general building security," and (iii) to perform required graffiti removal and rodent control.  (*Id*.)  The violations were cited between November 2014 to February 2015.  (Trial Ex. I.)

On April 20, 2015, BCOA sent an additional invoice for $6,500 in disciplinary fines for various CC&R violations cited in April 2015, including: wall construction without a permit, hanging heavy objects, installation of a wood burning stove without a permit, obstructing fire sprinklers, storing hazardous materials, installation of a satellite dish, non-permitted wiring, and failure to maintain the roof.  (*Id*.)  All these invoices included payment instructions as well as a warning that "late payments are considered delinquent," would result in late fees, and, once delinquent more than 30 days, could be subject to collection costs and interest.  (*Id*.)

### 3.      *Retro-Assessments*

On May 1, 2015, BCOA both issued a corrected assessment for the accelerated 2015 assessments from May to December of 2015 (Trial Ex. J) and also issued an invoice stating that Parker owed additional "retro-assessments" for the area that had been understated for the period from 2010 to 2014 (Trial Ex. V).  These amended or "retro-assessments" were based on a 2015 remapping project for condominium development, which determined that the Property encompassed an additional 584 square feet of assessable area.  The latter stated that Parker owed an additional $9,856.25 in assessments based on the remapping.  (*Id*.)  The invoice included warnings about late payments resulting in delinquency notices and acceleration of annual assessments.  (*Id*.)

### 4.      *Settlement Demands*

On October 29, 2014, BCOA emailed Parker's attorneys with a settlement demand.  (Trial Ex. E.; Stipulation, ECF No. 263, at 1:19.)  The communication indicated it was a "final October

United States District Court
Northern District of California

10

Settlement Offer" and that matters would change in November if the offer was not accepted by 6:00 pm on October 31, 2014. (Trial Ex. E.) The terms outlined therein required Parker to: (i) pay $25,000 "plus any additional legal costs incurred after 10/31/2014 right up until Settlement Agreement signing by Parker; (ii) sell or short sell Unit 990; (iii) agree never to own property in the BCOA again; (iv) replace her current realtor with a "competent realtor;" (v) dismiss all claims and cross-claims; (vi) exit bankruptcy and agree not to refile for a minimum of 90 days. (*Id*.) The settlement demand also stated that BCOA would accept "60 cents on the dollar for its existing liens" and agree not to foreclose on its liens for a six-month period. (*Id*). The settlement demand further stated:

> If the offer is not accepted, we will be moving forward with our lawsuit with new counsel, and cross-complaining Unit 990's tenant and realtor among other things inclusive of filing multiple adverse claims with the Bankruptcy Court. This will occur if you manage to maintain the Chapter 13 filing (which is full of errors by the way) vis a vis the Trustee's current valid move to dismiss, or convert to a Chapter 7 as has always been expected.

(*Id*., punctuation as in original.) BCOA further noted that "with the well demonstrated assessment revision power of the association" and the already pending disputes between them, the terms might provide Parker a "viable way to sell [Unit] 990 without the short sale path." (*Id*.)[8] On that same date, in a letter from Parker's counsel to BCOA, Parker offered to transfer title in the Property to Ocwen Loan Servicing (the senior secured lender), Vida Capital (the junior lender), and BCOA in satisfaction of the claims against the property, and required a response from BCOA no later than November 6, 2014. (Trial Ex. X.) BCOA did not respond.

On December 15, 2014, BCOA's counsel, Andrew Cantor, sent a nearly identical settlement letter to Parker's counsel. (Trial Ex. BX.)

///

///

---

[8] One week prior to the settlement demand, on October 21, 2014, the Board emailed members with a proposal for amendments to the CC&Rs "to protect the financial well[-]being of your association from the greatest threat that has ever faced it: Unit 990's non[-]performance" stating that "[t]he reason we need to do this is that Unit 990's bankruptcy may strip the >$90,000 in liens we now hold." (Trial Ex. AM.)

United States District Court
Northern District of California

### 5.      *BCOA's Lease of the Property and Collection of Rent*

On May 25, 2015, BCOA through its President Raj Patel, executed a lease of the Property to a third-party tenant for $6,500 per month.  (Trial Ex. AZ.)  The lease states that the "owner of Unit 990 has filed for, and been granted, Federal Chapter 13 bankruptcy protection."  (*Id*. at ¶ 0.1.)  It represents that BCOA "has 3 recorded liens on the property exceeding $220,000."  (*Id*.)  It further states that:

> In 2015 the BCOA was granted the right to foreclose on the property.  The BCOA was also granted the right to attempt to recover the revenue and operating costs it is legally entitled to, pursuant to its CC&Rs which are provided along with this Lease.  These powers were formally granted by a Federal Bankruptcy Judge in Federal Bankruptcy Court.  As a direct result, the BCOA is now leasing the surrendered property to a third party through this Lease agreement.

(*Id*.)[9]

In a June 2, 2015 email to other Bayside owners listing the BCOA Board's accomplishments to date, Jennings referred to Parker's bankruptcy as "defeated" and listed the "Unit 990 $78,000/yr Lease Deal" as enabling BCOA to "recapture [ ] all costs & delinquent amounts from Unit 990's unfortunate 2005-2015 member resident history."  (Trial Ex. BZ.)

### 6.      *Post-Petition HOA Assessments*

Finally, during the period after Parker filed her petition but before discharge, BCOA sent Parker several demands for payment of HOA assessments incurred during that period.  For example, in October of 2015, BCOA sent a Late Payment Demand & Notice of Delinquency for assessments and financial charges incurred January 2015 to October 2015.  (Trial Ex. Z.)  And on April 2, 2016, BCOA emailed Parker's counsel informing Parker that "Your Association Member's account is past due!" and attaching a Late Payment Demand & Notice of Delinquency with an omnibus listing of all post-petition assessments and fines for 2015 plus the accelerated monthly assessments for all of 2016.  (Trial Ex. AT.)

//

---

[9]  It was not until a proxy vote approximately one month later that the CC&Rs were amended to permit BCOA to lease an "abandoned" unit with delinquent assessments. (*See* Trial Ex. BD.)

### B.     Asserted Violations of the Discharge Order

Parker also alleged violations of the bankruptcy court's December 1, 2015 discharge order. Two are relevant for purposes of this appeal.

First, Parker claimed the issuance of BCOA's April 2, 2016 "Late Payment Demand and Notice of Delinquency" (Trial Ex. AT) requesting payment of $81,855.79 in post-petition HOA assessments, disciplinary fines, retro-assessments, and related finance charges, violated the discharge order.  The April 2, 2016 invoice did list a "zero balance" for pre-petition assessments, acknowledging that the pre-petition balance (as reflected in its proof of claim) had been discharged.  However, it sought payment for individual charges that BCOA issued post-petition, including the regular HOA assessment for the 2015 calendar year.

Second, Parker argued that BCOA's continued collection of rent on the Property was in violation of the discharge order.  This issue stems from BCOA's apparent continuation in collecting rent on the Property, pursuant to the lease BCOA executed in May of 2015, for the period after Parker received her Chapter 13 discharge.

### APPEAL OF BAYSIDE COURT OWNERS ASSOCIATION, INC., *ET. AL.*

**I.     DISCUSSION**

### A.     Asserted Error In Finding Violations of Automatic Stay (Issue 1)

In the Memorandum Disposition After Trial, the bankruptcy court found that "BCOA (and some of the individual respondents repeatedly and willfully violated the automatic stay" for the categories described above, namely: (1) late payment demands; (2) disciplinary fines; (3) retroactive assessments; (4) improper settlement demands; (5) lost rents on the Property; and (6) post-petition assessments.  (Mem. Dec. 11:19-20.)  As an overview, Respondents contend that the bankruptcy court erred because, after confirmation of the Plan on December 14, 2014, BCOA was permitted to exercise its *in rem* rights to "enforce" delinquent assessments, fines, and reimbursement costs.  Thus, Respondents contend BCOA was exercising its *in rem* rights by "(1) issuing [a] legally required notice of HOA delinquencies on January 2, 2015 [Trial Ex. 17]; (2) assess[ing] maintenance fees incurred post-petition and pre-discharge on March 15, 2015 [Trial Ex. I]; (3) correct[ing] a prior lien assessment through the "retro-assessment" [Trial Ex. J]; (4)

United States District Court
Northern District of California

invoic[ing] assessments post-petition; and (5) assess[ing] Disciplinary Fines post-petition."
(Opening Brief at 15:13-17.)  The Court considers each in turn.

### 1. Late Payment Demands

Respondents argue that the bankruptcy court erred in finding violations of the automatic stay based on the December and January Late Payment Demands for three reasons: (a) the automatic stay protecting the property ended when the plan was confirmed on December 17, 2014; (b) the *Goudelock* decision permits HOAs like BCOA to exercise their *in rem* rights, including under the Davis-Stirling Common Interest Development Act, Cal. Civ. Code § 4000 *et seq.* ("the Davis-Stirling Act"); and (c) the notices sent to Parker were not coercive or harassing in any event.

### a. The Stay Was Modified, Not Terminated

Respondents first argue that the bankruptcy court erred in finding the December 2, 2014 and January 2, 2015 Late Payment Demands to be violations of the automatic stay because the automatic stay ended on December 17, 2014, when the Chapter 13 Plan was confirmed and the property revested in Parker.  The Court disagrees.

The bankruptcy court found that BCOA violated "at the very least [section] 362(a)(6)." (Mem. Dec. at 10:19-21, 12:10-12.)  Section 362 (a)(6) provides that the automatic stay prohibits "*any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.*"[10]  Further, under 11 U.S.C. § 362(a)(5), the stay extends to "any act to create, perfect or enforce against property *of the debtor* any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title."  Subject to exceptions stated in the statute, the automatic stay continues "until the earliest of— (A) the time the case is closed; (B) the time the case is dismissed; or (C) if the case [is under, *inter alia*, chapter 13], *the time a discharge is granted or denied.*" 11 U.S.C. § 362(c)(2).

---

[10]  In reply, Respondents argue that section 362(a)(6) does not apply because BCOA "never obtained any proceeds from the estate property."  (*See* Reply at 14 fn 5.)  Section 362(a)(6) states that the filing of a Chapter 13 bankruptcy petition acts as a stay of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6).  Again, Respondents seem to misread the statute.

United States District Court
Northern District of California

(Emphasis supplied throughout paragraph.)  Thus, the plain words of the terms of the statute do not indicate that the *confirmation* of a plan dissolves the automatic stay.

Moreover, even if Respondents were correct that the stay ended upon **confirmation** of the Plan, confirmation did not occur until nearly two weeks *after* the December 2nd Late Payment Demand was sent to Parker, and therefore the transmission of that statement was a violation of the stay.  As of December 2nd, the Property was part of the bankruptcy estate and BCOA was not authorized to proceed with "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4).

Turning to the January 2, 2015 Late Payment Demand, Respondents contend that section 362(a)(5) does not apply because the Late Payment Demand was not "an attempt to perfect a *pre*petition claim" but rather "both Statements informed Parker of new, *post*-petition charges." (Appellant's Opening Br. at 17:14-16.)  A review of the January Late Payment Demand confirms that it included assessments incurred **both** pre- and post-petition.  In fact, at trial, BCOA conceded that the January Late Payment Demand demanded payment for both pre- and post-petition assessments.[11]  The Court therefore construes Respondents' argument to be that, as to the portion seeking post-petition assessments, BCOA's acts to "create, perfect, or enforce" a lien or collect on a claim for the post-petition assessments would not be covered by the bankruptcy or the automatic stay.  Thus, the Court analyzes whether such assessments were within the scope of those to be discharged and whether BCOA was permitted to proceed in its efforts to collect on those claims against Parker.

The Ninth Circuit established, in *Goudelock*, that post-petition assessments are treated as claims arising pre-petition and therefore dischargeable in a Chapter 13 bankruptcy.  Prior to *Goudelock*, there was no Ninth Circuit decision on this issue and a split of authority in the

---

[11]  Jennings testified at that BCOA:

. . . didn't know exactly how to handle the books to take the prepetition stuff off the statements and keep the postpetition stuff on the statements.  So until we figured out how to do that, we just stamped them "For Informational Purposes Only."

(Trial TR 602:4-18.)

analogous Chapter 7 bankruptcy context in decisions outside the Circuit. *Goudelock*, 895 F.3d at 636.[12]  In *Goudelock*, the Ninth Circuit held that "assessments that become due after a debtor has filed for bankruptcy under Chapter 13 of the Bankruptcy Code are discharged upon confirmation of the plan." *Id*. at 635.  The *Goudelock* court reasoned that "the [ongoing] obligation to pay [condominium association] assessments is a debt since it creates a right to payment." *Id*. at 638.  The debt was dischargeable because the debtor's obligation to pay the ***continuing*** assessments ***arose pre-petition***. *Id*. at 638.  The "personal obligation to pay [HOA] assessments was not the result of a separate, post-petition transaction but was created ***when she took title to the condominium unit***." *Id*. (emphasis supplied).[13]  Said differently, the court found that "[b]efore becoming due each month, the assessments, which are part of the pre-petition debt, are unmatured and are also contingent upon continued ownership of the property." *Id*.

Based thereon, the bankruptcy court concluded: "if a claim such as Goudelock's is a dischargeable *pre-petition* claim, it is also subject to the automatic stay." (Mem. Dec. at 11:14-15, emphasis in original.)  Considering this legal issue *de novo*, the Court agrees.  Here, as in *Goudelock*, the January Late Payment Demand sought to collect on obligations that *arose,* as defined by Circuit authority, prior to the filing of the petition, even if they matured after the filing of the petition.  It follows that the January Late Payment Demand was an attempt to collect on a claim dischargeable in the bankruptcy.  Having established the post-petition assessments as debts arising prior to the petition, the question becomes whether the automatic stay remained effective and thereby prevented BCOA from attempting to collect on those debts.

---

[12]  One line of authority found that the obligation to pay continuing assessments was dischargeable as a pre-petition debt since it arose pre-petition even if it matured post-petition. *Id*. The other line of authority held that such assessments were not dischargeable because the obligation to pay assessments "ran with the land" and therefore arose as an incident of the debtor's *post-petition* ownership of the property. *Id*. at 636-37.  The Ninth Circuit found the reasoning of the former more persuasive. *Id*. at 637.  It controls here.

[13]  *Goudelock* noted the distinction between a homeowners' association's "two state law remedies . . . to address the failure to pay [condominium association] assessments: an *in rem* remedy of a lien and right of foreclosure; and an *in personam* remedy allowing it to bring suit against the property owner." *Id*. at 637 (emphasis supplied).  "While the *in rem* ***lien*** is not dischargeable under Chapter 13, the pre-petition *in personam* ***obligation*** is." *Id*. (emphasis supplied).

United States District Court
Northern District of California

1  Respondents contend that confirmation of the Plan ended the bankruptcy stay because

2  confirmation of the plan "end[ed] the stay protecting the Property." (Opening Brief at 15:10-11.)

3  In a Chapter 13 bankruptcy, the property of the bankruptcy estate generally "revests in the debtor

4  upon plan confirmation, unless the debtor elects otherwise in the plan." *In re Jones*, 657 F.3d 921,

5  928–29 (9th Cir. 2011) (citing 11 U.S.C. § 1327(b)). "Except as otherwise provided in the plan or

6  in the order confirming the plan, the property vesting in the debtor . . . is free and clear of any

7  claim or interest of any creditor provided for by the plan." 11 U.S.C. § 1327(c).

8  Here, paragraph 4.01 of Parker's Plan provided that the property of the bankruptcy estate

9  revested in Parker at the time of confirmation. (BKDkt. No. 45 at ¶ 4.01.) Specifically, it

10  provided that "Property of the estate will revest in Debtor upon confirmation. . . . After the

11  property revests in Debtor, Debtor may sell, refinance or execute a loan modification regarding

12  real or personal property without further order of the court with the approval of Trustee." (*Id.*)

13  Further, the Plan provided that, upon confirmation, the "collateral [was] being ***surrendered***" to

14  secured creditors, including BCOA. (*Id.* at ¶ 2.06, emphasis supplied.) The Plan stated that, as to

15  those Class 3 Secured Creditors, "[u]pon confirmation of this plan, the automatic stay is ***modified***

16  to allow a Class 3 secured claim holder to ***exercise its rights against its collateral***." (*Id.* at ¶ 2.06,

17  emphasis supplied.) The plan confirmation order issued by the bankruptcy court reiterated that

18  "[t]he Plan provides that the holder of [a secured claim] retain[s] the lien securing such claim" and

19  that "[t]he Debtor surrenders the property securing such claim to such holder." (BKDkt. No. 50.)

20  Thus, based upon the plain terms of the Plan, the automatic stay was modified, not ended, by Plan

21  confirmation.

22  The modified stay allowed the Property to be surrendered to BCOA and the other secured

23  creditors, such that they were allowed to exercise their ***existing*** lien rights against the Property but

24  were otherwise prohibited from seeking payment on debts directly from Parker.[14] The stay

25  ─────────────────────

26  [14] While the Bankruptcy Code does not define "surrender," courts have interpreted the term to mean the debtor "will make the collateral available so the secured creditor can, if it

27  chooses to do so, exercise its state law rights in the collateral." *Razzak v. Wells Fargo Bank, N.A.*, No. 17-CV-04939-MMC, 2018 WL 1524002, at *4 (N.D. Cal. Mar. 28, 2018) (quoting *In re Rosa*,

28  495 B.R. 522, 523 (Bankr. D. Haw. 2013)). In contrast to "*vesting*" of the property—in the debtor (*cont.*)

otherwise remained in place.  Whether BCOA's *in rem* rights extended to its actions with respect to those additional assessments is the focus of its next argument on appeal.

        *b.*    *Late Payment Demands Were Not An Exercise of In Rem Rights*

Respondents next contend that the bankruptcy court erred in finding a stay violation because the Late Payment Demands were simply an exercise of its *in rem* rights in compliance with California's Davis-Stirling Common Interest Development Act, Cal. Civ. Code § 4000 *et seq.* ("the Davis-Stirling Act"), and therefore not barred by the stay.  Under the Davis-Stirling Act, an owners' association must provide certain notices to the owner in order to perfect and record a lien for delinquent assessments.  Respondents argue that December and January Late Payment Demands were "informational" notices sent pursuant to the Davis-Stirling Act.  Respondents contend that the bankruptcy court ignored the Davis-Stirling Act's requirements in concluding that it had violated the stay, despite BCOA's testimony that the Act required it to send those notices and assessments.  (Opening Brief at 17:11-13, citing Trial TR at 602:20-23.)[15]  BCOA further argues that bankruptcy court's findings are contrary to the Ninth Circuit's decision in *Goudelock*, which affirmed that a creditor continues to be allowed to pursue its *in rem* rights despite a bankruptcy.

Here, Respondents' arguments fail on myriad grounds.  As a threshold matter, by making this argument Respondents necessarily concedes that the Late Payment Demands were necessary *in order to secure* its claim to additional assessments.  As Respondents lays out in their brief,

---

or another entity—which encompasses a transfer of ownership, "*surrender* does not transfer ownership of the surrendered property."  *In re Rosa*, 495 B.R. at 523-24 (citing 11 U.S.C. § 1322(b)(9)) (emphasis supplied).  Thus, although confirmation may result in surrender of the property to secured creditors in satisfaction of their claims, surrender still requires that the creditors take some action to exercise their rights against the collateral itself.  *In re Failla*, 838 F.3d 1170, 1176-77 (11th Cir. 2016) (while debtor's surrender of property gives creditor the immediate right to sell it, creditor still must take *some* legal action as against real property, such as foreclosure, so that priority of multiple creditors' claims and any surplus value exceeding liability can be determined) (citing *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997)).

[15]  With respect to the Late Payment Demands, Jennings testified:

> And then on top of that there are mechanisms in the Davis-Stirling Act that enable an HOA to get paid when it has delinquent debt. And those mechanisms require the issuance of particular types of notices.

(Trial TR: 602:20-23.)

United States District Court
Northern District of California

under the Davis-Stirling Act, assessments (as well as fines, costs of collection, late charges and interest) are a "debt" to the HOA that may be sought personally against the owner or *in rem* by foreclosing on a "validly recorded" lien. (*See* Opening Brief at 16:1-21; *see also id*. 17:14-15 ["The Statements provided the statutory notice required for BCOA to perfect a lien for $22,558.20 in new assessments."].) The Notices were sent to Parker "*to obtain and perfect liens*" (*id*. at 17:11-13, emphasis supplied)—liens that BCOA hoped would survive the bankruptcy discharge as *secured* claims. In other words, BCOA understood that, in the absence of additional notices to Parker, its claim for additional assessments, fines, etc., were *not* claims secured by present lien rights under the Davis-Stirling Act, but claims it had yet to secure by recording liens consistent with the statute.[16]

The terms of the confirmed Plan and the bankruptcy court's order for relief from the automatic stay did not grant convert BCOA's unsecured claims into secured ones, only to exercise its secured rights against the Property. (BKDkt. No. 45 at ¶ 2.06 ["[u]pon confirmation. . . *the automatic stay is modified to allow a Class 3 secured claim holder to exercise its rights against its collateral*."]; Motion for Relief from Stay, BKDkt. No. 53 at 2, [seeking to "vacate the automatic stay entered in this proceeding *as it pertains to real Property . . . so that BCOA's secured interest in and to the Property may be foreclosed or otherwise disposed of in any manner permitted by the laws of the State of California*."].) (Emphasis supplied in both.) To the extent that Respondents argue BCOA was entitled to "exercise its *in rem* rights" under the Davis-Stirling Act in order to record liens on debt so that it could perfect and enforce such liens, despite the bankruptcy Plan and discharge, serves as an end-run around the Bankruptcy Code.

BCOA undisputedly never pursued its secured, *in rem* rights against the property itself, never seeking to foreclose on any liens. Instead it elected to seek payment from Parker to satisfy the debt by way of the Late Payment Demands. The bankruptcy court expressly found that the Late Payment Demands were attempts to collect against Parker *personally* in violation of

---

[16]  BCOA contends that the bankruptcy court "incorrectly advised" it to amend its proof of claim to protect its rights, which BCOA rejected in favor of sending invoices demanding payments and threatening action to record new liens.

362(a)(6), not an exercise of foreclosure rights.  (Mem. Dec. pg. 17 fn. 19.)  This Court finds no clear error in the bankruptcy court's findings that the Late Payment Demands were efforts to collect personally on these debts.  BCOA's demands were for payment of *money*, not turnover of title to the property or collection on secured claims solely from *disposition of the real property itself.*[17]

Respondents' reading of *Goudelock* misunderstands its holding.  *Goudelock* described the distinction between a homeowners' association's "two state law remedies . . . to address the failure to pay [condominium association] assessments: [namely,] an *in rem* remedy of a lien and right of foreclosure; and an *in personam* remedy allowing it to bring suit against the property owner." *Goudelock*, 895 F.3d. at 637.  It further noted that, "[i]n the bankruptcy context, the Supreme Court has distinguished between **secured *in rem*** debts and **unsecured *in personam*** debts: *in personam* debts are dischargeable while the creditor retains its *in rem* property interests." *Id*. at 640 (citing *Johnson v. Home State Bank*, 501 U.S. 78, 82–84 (1991)) (emphasis supplied). "While the *in rem* **lien** is not dischargeable under Chapter 13, the pre-petition *in personam* **obligation** is." *Id*. at 637 (emphasis supplied).  The statements in *Goudelock* are descriptive.  Nothing in the decision supports the argument that a homeowner's association can convert an unsecured obligation into an *in rem* lien or expand the relief from the automatic stay to cover such an action, as Respondents urge.

Here, as in *Goudelock*, the January Late Payment Demand sought to collect on obligations that arose prior to the filing of the petition.  To the extent Respondents could convincingly claim that the January Late Payment Demand was meant to perfect a lien, it was an effort to perfect a

---

[17]  Moreover, BCOA's arguments lack plausibility since the Late Payment Demands, on their face, do not comply with the statutory disclosure and service requirements of the Davis-Stirling Act. *See* Cal. Civ. Code § 5660 (a)-(e); *see also* Cal. Civ. Code § 5675(a) ("the amount of the assessment . . . shall be a lien on the owner's separate interest in the common interest development from and after the time the association causes to be ***recorded*** with the county recorder . . . a notice of delinquent assessment"); and §5675(a)-(e) (setting forth further requirements and procedures for perfecting the lien, including manner of service), *compare* Trial Exs. F, H.  As BCOA acknowledges, the notice requirements of the Davis-Stirling Act are "strictly construed." *See Diamond v. Superior Court*, 217 Cal.App.4th 1172, 1190 (2013) (discussing notice requirements at former Cal. Civil Code § 1367.1, now renumbered at sections 5600 through 5740).

United States District Court
Northern District of California

United States District Court
Northern District of California

lien for debt that arose *before* the petition.  *Goudelock*, 895 F.3d at 638.  The automatic stay bars any act to perfect a lien to secure a claim that arose pre-petition against the property of the debtor. 11 U.S.C. § 362(a)(5) ("any act to create, perfect or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title.").  Section 362(a)(5) precludes a creditor from taking action secure a debt it has not secured prior to the petition.  *See In re Conceicao*, 331 B.R. 885, 893–94 (B.A.P. 9th Cir. 2005) (creditor prohibited from amending judgment to comply with statutory requirements for creating a valid lien against debtor's property prior to discharge due to automatic stay and post-discharge due to discharge injunction).  "Prior to Debtors' discharge, Creditor also could not act to secure the personal liability of Debtors . . . because section 362(a)(5) prohibited Creditor from performing 'any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before commencement of the case under this title.'"  *Id*.  It therefore follows that the January Late Payment Demand was a stay violation.

This Court's decision in *In re Warren*, No. 15-CV-03655- YGR, 2016 WL 1460844, at *4 (N.D. Cal. Apr. 13, 2016), cited by Respondents, is consistent with the analysis here.  In *Warren*, the HOA Board "voted to record an assessment lien against the Property for delinquent assessments and related costs," "served Debtor . . .with a notice of its intent to record a lien against the Property for the unpaid assessments and related costs," "recorded a notice of assessment lien" with the county recorder, and served a copy of the lien on debtor "by certified mail."  *Id*. at 1.  The 2008 Lien purported to include "any and all other assessments, collection costs, interest, attorneys' fees and other expenses as may become due to [Claimant] with respect to the Property subsequent to the typed dates set forth above until all amounts due to [Claimant] with respect to the Property are paid in full."  *Id*.  The HOA did not file and record any additional liens for assessments that came due thereafter.  *Id*. at *2.  Nearly six years later, the debtor filed a Chapter 13 bankruptcy petition.  *Id*.  The HOA then sought to claim additional unpaid assessments that came due in the years 2008 to 2014.  *Id*.  This Court held "the language of the 2008 Lien purporting to secure *future* assessments is not permissible under the Davis-Stirling Act."  *Id*. at *4 (emphasis supplied). The HOA was limited to collection on the amounts in the recorded 2008 Lien.  "The 2008 Lien

21

did not secure assessments that came due and remained unpaid *subsequent* to its recordation." *Id.* at *5 (emphasis supplied). *Warren* was completely silent on the matter at issue here—whether a creditor can take *post*-petition steps to record a lien for HOA fees that arose *pre*-petition, despite the automatic stay.[18]

c.   *Late Payment Demands Were Coercive or Harassing*

Finally, Respondents appeal the bankruptcy court's decision contending that the Late Payment Demands were sent for "for informational purposes only" and they were, at most, demands for payment "with **no threat to obtain a lien** or other coercion." (Opening Brief at 19:21-22, emphasis supplied.) Thus, Respondents argue that no violation of the automatic stay can be found for a mere payment demand.

First, Respondents' argument is internally inconsistent, given that they also strenuously argue above that the Late Payment Demands were sent in order to perfect liens under the Davis-Stirling Act consistent with its *in rem* rights. (*See* Opening Brief at 17:11-18 [BCOA sent the Late Payment Demands "to obtain and perfect liens"].)

Second, whether a communication is permissible or prohibited under section 362(a) is a fact-driven inquiry, and it is not susceptible to any bright line test. *In re Zotow,* 432 B.R. at 258. "[M]ere requests for payment are not barred absent coercion or harassment by the creditor." *Id. (citing Morgan Guar. Tr. Co. of New York v. Am. Sav. & Loan Ass'n*, 804 F.2d 1487, 1491 (9th Cir. 1986)). Prohibited communications include those where direct or circumstantial evidence shows the creditor's actions were geared toward collection of a prepetition debt, were accompanied by coercion or harassment, or otherwise put pressure on the debtor to pay. *Morgan,* 804 F.2d at 1491; *In re Draper,* 237 B.R. 502, 505–06 (Bankr.M.D.Fla.1999). "Examples of

United States District Court
Northern District of California

---

[18] To the extent BCOA would contend that the CC&Rs themselves provide an enforceable lien, it is clear that such broad "present lien" language is insufficient to establish a lien for payment of assessments of a specific amount. *See In re Guajardo*, No. BR 15-31452 DM, 2016 WL 943613, at *3 (Bankr. N.D. Cal. Mar. 11, 2016) (recorded HOA lien for assessments in 2008 could not encompass future delinquencies and costs where "[t]he CCRs here are not that specific, instead imposing a "present and continuing lien" to secure the payments of levied assessments[;]. . . . the general imposition of a "present" lien at the time of and by operation of the CCRs with respect to all future and potentially unknown assessments does not satisfy the notice and lien provisions of the Civil Code.")

communications cited by the Ninth Circuit as violating the automatic stay includ[e]: (1) notice of intent to terminate lease, (2) notice of intent to terminate franchise, (3) notice of medical clinic refusal to provide future medical services because of refusal to pay for prior services, (4) letter informing debtor that an attorney had been hired to collect a delinquent account, (5) college refusing to release transcripts as a method to force payment, and (6) a creditor who made repeated visits and telephone calls to a debtor." *In re Singh*, 457 B.R. 790, 800–01 (Bankr. E.D. Cal. 2011); *see also Morgan,* 804 F.2d at 1491 (stay prohibits "attempts to confiscate the debtor's property or require the debtor to act affirmatively to protect its interests").

Here, the bankruptcy court found that the Late Payment Demands sent to Parker were coercive and harassing. In reaching its conclusion, the bankruptcy court weighed many considerations. One, BCOA and Parker were already well-aware of the amount of BCOA's secured claim and how it was being treated in bankruptcy. Two, after two years of state court litigation and inclusion of the claimed unpaid assessments in the bankruptcy petition, the Late Payment Demands served no purpose *other than* to harass and pressure Parker. Three, Jennings himself admitted at trial that BCOA should not have issued payment demands including pre-petition assessments. Moreover, the record reveals that the December and January Late Payment Demands, along with all of the other "Late Payment Demand & Notice of Delinquency" documents sent to Parker, included statements on the bottom of each page that figuratively screamed off the page:

- "!!! IMPORTANT INFORMATION ABOUT LATE PAYMENTS !!!"
- "the amounts on this notice are delinquent!"
- "Delinquent monthly assessments not paid within 30 days after this notice of delinquency will cause your ENTIRE ANNUAL ASSESSMENT to become due"
- that the CCRs allow BCOA "to sell a member's property to the highest bidder in order to satisfy the lien present against it," and
- "It is therefore very important that you provide full payment to avoid the foregoing CC&R 6.6 enforcement activities from affecting your account and your Association property."

(Trial Exs. F, H.)

Contrary to Respondents' argument, the bankruptcy court acknowledged that BCOA may have believed it was sending Late Payment Demands with a watermark or "overlay" stating "For

Informational Purposes Only" to Parker.[19]  The bankruptcy court found that, even accepting BCOA's assertion as true, the invoices nevertheless were sent with the intent to harass Parker.  As noted by the bankruptcy court, when evidence of coercion or harassment is present, a disclaimer stating the communication was sent for "informational purposes only" is ineffective.  *In re Zotow*, 432 B.R. at 259 *(citing Draper,* 237 B.R. at 506.)[20]

In summary, this Court finds no clear error in the bankruptcy court's conclusions that the Late Payment Demands violated the stay and were coercive and harassing.[21]

### 2.    *Disciplinary Fines*

Respondents next argue that the bankruptcy court improperly found the disciplinary fines BCOA imposed and invoiced to Parker for various violations of the CC&Rs were based on pre-petition conduct and violated the stay.  (Mem. Dec. at 14:24-25.)  Respondents argue that the bankruptcy court erred because: (i) BCOA assessed the fines based upon post-petition findings of post-petition violations inclusive of failure to maintain the Property and failure to comply with the CC&Rs; and (ii) *Goudelock* addressed only regular monthly assessments, not assessments for post-petition conduct like failing to maintain the property or otherwise comply with the CC&Rs, which are non-dischargeable, even after *Goudelock*.

With respect to the first issue, the bankruptcy court found that virtually all the grounds for the fines existed pre-filing, and therefore were properly classified as pre-petition claims.  It based its decision on the following findings: For starters, Parker had vacated the Property shortly after the filing of her petition, the fines for various alterations to the unit (*i.e.*, unpermitted wiring,

---

[19] Parker contends they contained no such overlay while Jennings, on behalf of BCOA, testified that they did.  (*See* Trial TR at 602:8 and 605:18-606:23; Trial Exs. 17, F, and H.)

[20]  For example, in *Draper*, a creditor was found to have violated the automatic stay where it continued to send invoices stating amounts past due and including payment coupons and envelopes to return payments, despite a disclaimer that the invoices were for informational purposes.  *In re Draper*, 237 B.R. at 505 (Bankr. M.D. Fla. 1999).

[21] The decision in *In re Diwa*, No. 05-31364 DM, 2007 WL 1462398, at *2–3 (N.D. Cal. May 18, 2007) is distinguishable.  There, the reviewing district court found that one letter from the tax authorities indicating that the debtor owed money and that it "may file a state tax lien against your property" did not demonstrate coercion or harassment.  *Id*.  Here, given the context in which multiple communications were sent to Parker and other actions taken in violation of the stay, the evidence of coercion and harassment is far different.

United States District Court
Northern District of California

lighting fixture, satellite dish, wood stove, wall construction and sprinkler head obstruction, hanging a model airplane attached to ceiling joists) "pre-dated her bankruptcy." (*Id.* at 6:26-7:4.)[22]  Further, the fines for unpaid taxes were the same unpaid taxes listed on BCOA's proof of claim as having been owed for tax years *prior* to the petition's filing, and thus was an imposition of additional charges for pre-petition debt. (Mem. Dec. at 7:4-9.)[23]

Respondents contend that the fines arose due to Parker's "post-petition destruction of the Property, broken windows, painted graffiti, and unapproved squatters" that could not have been "fairly contemplated" at the time of the petition. (Reply at 16:9-12.)  However, Respondents cite no evidence in the record to contradict the bankruptcy court's factual determination that these matters occurred prior to the filing of the petition.  In short, Respondents fail to show that the bankruptcy court's factual determinations as to the basis for the fines were clearly erroneous.

Second, Respondents' argument that the bankruptcy court wrongly applied *Goudelock* to disciplinary assessments misstates the bankruptcy court's decision and fails to persuade in any event. *Goudelock* reiterated the Ninth Circuit's long-standing "fair contemplation" test. *Goudelock*, 895 F.3d at 638.  The bankruptcy court here cited not only to *Goudelock* but to other authorities applying the "fair contemplation" test, including *In re Hassanally*, 208 B.R. 46 (B.A.P. 9th Cir. 1997) and *Mountain View Hospital, LLC v. Sahara, Inc.*, No. 4:07-CV-464-BLW, 2011 WL 4962183, at *11–12 (D. Idaho Oct. 17, 2011).  Based on these authorities, the bankruptcy court concluded that the obligation to comply with the CC&Rs was a "contract-like" obligation, and that claims arising from a violation of the CC&Rs were within the fair contemplation of the parties at the time of the bankruptcy. (Mem. Dec. 14:21-15:16.)

In *Hassanally*, the Ninth Circuit Bankruptcy Appellate Panel stated the fair contemplation

---

[22]  BCOA plainly was aware that Parker was no longer living in the Property, given its December l, 2014 email to Bayside residents, drafted by Jennings, which stated, in part, that "Unit 990 is now derelict (at least with it empty, we won't be paying for water and gas and gate electricity for its former residents to enjoy for 'free')" (*See* Mem. Dec. at 7:14-18, quoting Trial Ex. BW.)

[23]  Moreover, the bankruptcy court found that BCOA was unwilling to accept Parker's offer to convey title under the plan, instead instituting a strategy to recoup unpaid assessments by fining Parker for non-compliance with the CC&Rs. (Mem. Dec. 5:17-18.)

United States District Court
Northern District of California

test as follows:

> where debtor committed the act or omission complained of prior to filing bankruptcy, and the claimant has a relationship to the act or omission at the time, such as being the patient or a contracting party, the claim arose at that point in time even if there has been no indication or manifestation of the consequences of the act or omission.  It is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made misrepresentations to induce the making of the contract.  Thus, a contingent claim arises at that point in time, although it may never mature.

*In re Hassanally*, 208 B.R. at 53 (quoting *In re Russell*, 193 B. R. 568, 571 (Bankr. S.D. Cal. 1996).  The district court in *Mountain View* reiterated this test, stating that claims arising under a contract effective prior to the bankruptcy filing are discharged as are tort claims where the wrongdoing occurs before discharge even if the resulting injury occurs after.  *Mountain View Hosp.*, 2011 WL 4962183, at *11–12.[24]  Reviewing this issue of law *de novo*, the Court finds that the bankruptcy court did not err in concluding the claim for the disciplinary fines arose prior to the petition and therefore actions to collect on such claims would be barred by the automatic stay.

Respondents' citation to *In re Foster,* 435 B.R. 650 (9th Cir. BAP 2010) does not aid, as *Goudelock* expressly abrogated that case.  *See Goudelock*, 895 F.3d at 637.  Further, *Foster* did not involve collection of delinquent post-petition HOA dues and did not address disciplinary assessments in any manner.  *Foster*, 435 B.R. at 663 ("this appeal did not involve the collection of delinquent Assessments because debtor's postpetition HOA dues had not yet been assessed").  Similarly, Respondents' citation to *O'Loghlin* and *Castellino* is unavailing since neither case concerned treatment of HOA assessments.  Indeed, the principles in *Castellino* support a finding that the disciplinary assessments here arose pre-petition and were "within the fair contemplation" of the parties at the time of the petition.  *Camelback Constr. v. Castellino Villas, A.K.F. LLC*, 836 F.3d 1028, 1036 (9th Cir. 2016) (where litigation was pending at the time of the petition and contemplated to resume after discharge, "contingent claim for attorneys' fees" based on that

---

[24] The test has also been applied to find, in a case concerning liability, that the State of California, a claimant, "had sufficient knowledge of the debtor's potential liability [for hazardous waste clean-up ] to give rise to a contingent claim for cleanup costs before [debtors] filed their personal bankruptcy petition" and that the State's claims for such clean-up costs were discharged in bankruptcy, even if the State only issued a notice of debtor's liability *after* the bankruptcy discharge.  *In re Jensen*, 995 F.2d 925, 931 (9th Cir. 1993).

United States District Court
Northern District of California

1   litigation was within fair contemplation of the parties and was discharged upon plan

2   confirmation).  *O'Loghlin* considered whether a debtor can discharge debt arising from

3   discriminatory conduct that began pre-petition and continued post-***discharge***.  *O'Loghlin v.*

4   *County of Orange*, 229 F.3d 871, 874-75 (9th Cir. 2000) (where county was alleged to have

5   engaged in an ADA violation that continued after its debts were discharged in bankruptcy, "we

6   hold that the County is liable for post-*discharge* conduct that violated the ADA").

7          Third, although Respondent argues that the notices were "mere demands" and not coercive

8   or harassing, the bankruptcy court discussed ample evidence to find that BCOA imposed the fines

9   as part of its strategy to "punish Parker for filing a bankruptcy and discharging her HOA liability."

10  (Mem. Dec. at 15:13-16.)  The Court finds no basis for determining that this factual finding was

11  clearly erroneous.

12                  **3.          *Amended, "Retro-" Assessments***

13         The "retro-assessment" invoice dated May 15, 2015[25] concerned a remapping of the

14  Property in which it set forth the "understated" previous assessments for the years 2010 through

15  2014.  (Exhibit V.)  The bankruptcy court found the transmission of the invoice a violation of the

16  automatic stay.  Respondents argue that the bankruptcy court erred because the invoice was a mere

17  demand for payment without more.  (Opening Brief at 21:12-15.)

18         The Court disagrees.  Even if BCOA believed that assessments incurred post-petition were

19  not covered by the bankruptcy, the invoice, on its face, plainly sought assessments for the pre-

20  petition period. (Mem. Dec. at 16:8-13.)  Respondents have not shown how these findings of fact

21  are "clearly erroneous."  On reply, Respondents argue, for the first time, that the bankruptcy court

22  misapplied the "fair contemplation" test with respect to the retro-assessments.  (Reply Brief 16: 6-

23  12, 22-24.)  Again, based on the explanation of the fair contemplation test in *Goudelock*,

24  *Hassanally*, and *Mountain View* above, the Court finds no error in the bankruptcy court's legal

25  conclusions on this point.

26         //

27  ─────────────────────

28         [25]  Document described, *supra*, page 10.

United States District Court
Northern District of California

### 4.    *Settlement Demands*

Respondents next argue that the bankruptcy court erred in finding the settlement letters to violate the stay, since it sent the letters to Parker's counsel in good faith and good faith settlements negotiations are not stay violations, citing *In re Diamond*, 346 F.3d 224, 227 (1st Cir. 2003). Further, Respondents contend that the bankruptcy court's decision was unsupported by the facts, since it failed to explain its conclusion that the settlement offers were an attempt to "make Parker's life miserable." (Mem. Dec. at 12:23-24; Trial TR at 7:2-5.)

The bankruptcy court found that BCOA's Settlement Demands on October 29, 2014, just days after she filed her bankruptcy petition, and again on December 15, 2014, "were coercive, harassing attempts to collect a pre-petition debt and thus violated the automatic stay." (Mem. Dec. 12:13-14.) The court set out in detail the facts and circumstances that it considered, including that the communications (i) demanded payment of $25,000 "plus any additional legal costs incurred after 10/31/2014 right up until Settlement Agreement signing by Parker;" and (ii) threatened that:

> If the offer is not accepted, we will be moving forward with our lawsuit with new counsel, and cross-complaining Unit 990's tenant and realtor among other things inclusive of filing multiple adverse claims with the Bankruptcy Court. This will occur if you manage to maintain the Chapter 13 filing (which is full of errors by the way) vis a vis the Trustee's current valid move to dismiss, or convert to a Chapter 7 as has always been expected.

(*Id.*, citing Trial Ex. E, punctuation as in original.) The communication also stated that BCOA would accept "60 cents on the dollar for its existing liens." (*Id*).[26] The bankruptcy court also evaluated the credibility of the author of the October 29 Settlement Demand, BCOA Secretary/Treasurer Laurence Jennings. The bankruptcy court noted that Jennings evidenced "significant disdain for the bankruptcy process" and, holding himself out as an HOA expert, advised the Board on all things related to its handling of Parker's Property. (Mem. Dec. at 3-4, fn. 4.) Based on this evidence, the bankruptcy court concluded that the Settlement Demands were "an attempt to make Parker's life miserable" through "improper, willful attempts to collect pre-petition

---

[26] In the settlement demand, BCOA further outlined a veiled threat to increase assessments if Parker did not agree to the terms, noting that "with the well demonstrated assessment revision power of the association" and the already pending disputes between them, the terms might provide Parker a "viable way to sell [Unit] 990 without the short sale path." (*Id.*)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  debt. . . . [that] were harassing and coercive in nature, and were emblematic of BCOA's general

2  disdain for the bankruptcy process." (Mem. Dec. at 12:13-25, 13:1-2.)

3       The First Circuit's decision in *In re Diamond* is instructive, though not supportive of

4  Respondents' arguments here.  The court there held that settlement negotiations during the

5  pendency of a bankruptcy "are not per se violations of the automatic stay" but instead must be

6  evaluated based upon whether they "constituted impermissible 'coercion or harassment.'"  *In re*

7  *Diamond*, 346 F.3d 224, 227 (1st Cir. 2003).  Coercion and harassment, in turn, are evaluated on

8  "the immediateness of any threatened action and the context in which a statement is made."  *Id.*  In

9  *Diamond*, a creditor threatened to report the debtor to the real estate commission and have his

10  broker's license revoked unless the creditor's claim was settled.  *Id.*  The court found that the

11  settlement tactic could be found to be coercive since it indicated "sufficiently imminent" action by

12  the creditor to threaten the source of his livelihood.  *Id.* at 228.  Because the creditor "placed

13  Diamond between a rock and a hard place," its settlement communications could be considered

14  coercive, and therefore a violation of the automatic stay.  *Id.* at 227.  That the creditor might have

15  had a "good faith basis" for reporting Diamond to the real estate commission was immaterial to

16  whether the statement was meant to coerce him to choose between settling his bankruptcy or

17  potentially losing his ability to earn a living post-bankruptcy.  *Id.* at 228-29.  The court further

18  found that the fact the statement was made to the debtor's counsel rather than to the debtor himself

19  was not determinative "particularly where counsel swiftly communicated the threat to his client."

20  *Id.* at 228.

21       Based on *Diamond* and the other authorities cited, the Court finds that the bankruptcy court

22  committed no legal error in concluding that "the tone, context, and content, and the inclusion of

23  any threat of continued legal action outside of the Bankruptcy Court should the debtor reject the

24  offer" (Mem. Dec. at 12:2-8) were the appropriate criteria for determining whether settlement

25  negotiations (or other demands for payment) constituted violations of the automatic stay.  Further,

26  Respondents have not shown that the bankruptcy court's factual findings of coercion in the

27  Settlement Demands were clearly erroneous.

28

United States District Court
Northern District of California

### 5.    *BCOA's Lease of the Property*

Next, Respondents argue that the bankruptcy court erred in finding its lease of the Property was a willful violation of the automatic stay.  Respondents contend Parker chose to surrender the Property and, upon Plan confirmation, she had "no further rights in the property."  Thus, it contends that its lease of the property was permitted as an *in rem* remedy authorized by the CC&Rs (albeit after the lease was executed) and Parker was not entitled to the Property's rents after surrender. The bankruptcy court's finding otherwise improperly afforded "too narrow an effect" of surrender.

It is Respondents, not the bankruptcy court, that misunderstand the legal effect of surrender.  As explained above, surrender does no more than give secured creditors the *opportunity* to foreclose on their secured rights in the collateral.  *Razzak*, 2018 WL 1524002, at *4.  Confirmation of the Plan did not give BCOA ownership rights in the Property nor permit it to seize the Property and lease it to a third party.  "[S]urrender does not transfer ownership of the surrendered property."  *In re Rosa*, 495 B.R. at 523-24 (citing 11 U.S.C. § 1322(b)(9)).  Surrender requires that the creditors take some action to exercise their rights against the collateral itself.  *See In re Failla*, 838 F.3d at 1176-77 (citing consistent authority from First and Fourth Circuits and bankruptcy treatise).  This BCOA did not do.  Further, Respondents ignore that, upon confirmation, the property revested in Parker, permitting her to "sell, refinance or execute a loan modification" without further order of the court with the approval of Trustee."  (BKDkt. No. 45 at ¶ 4.01.)

Respondents' citation to *In re White* does not change this Court's *de novo* analysis of the legal effect of surrender.  In *White*, which predates *Failla*, the court considered a situation where debtors proposed to "surrender" **personal** property, including clothing, furniture and appliances, to satisfy an IRS tax lien, despite IRS rules prohibiting a tax levy on such property.  *In re White*, 487 F.3d 199, 206 (4th Cir. 2007).  Debtors there planned to "partially surrender" the personal property, but in fact retain possession of it until the IRS obtained a judgment or attempted an administrative levy post-discharge.  *Id*. at 206-07.  Under those circumstances, the court found that the debtor's "retention of property that is legally insulated from collection is inconsistent with

30

surrender" and thus their proposal was not a true surrender of the personal property. *Id.* *White* provides no basis for concluding that a surrender of real property, as to which multiple creditors claimed interests secured by liens or deeds of trust, encompassed transfer of possession or ownership of the real property.

Here, the confirmation order ***vested*** the property in Parker, reiterating her ownership and title, as it ended the bankruptcy estate. *See Rosa*, 495 B.R. at 523-24.  Parker continued to retain ownership and title in the property until a creditor foreclosed on the property in 2016.  Thus, the automatic stay prevented BCOA from seizing it, leasing it, and pocketing the proceeds. *See* 11 U.S.C. § 362(a)(5), 362(c)(2) (prohibiting actions to collect or recover debts covered by bankruptcy until such time as the case is closed, dismissed, or discharge granted or denied).

Further, the bankruptcy court found that BCOA's rental of the Property constituted a willful violation of the automatic stay, extensively citing evidence that BCOA acted in disregard of the bankruptcy in order to recoup the unpaid assessments not by foreclosing on its lien but by executing the lease and amending the CC&Rs in "direct response to Parker's Chapter 13 bankruptcy." (Mem. Dec. 16:15-17:3.)[27]  "When stripped of its legal jargon . . . the ballot initiative [to amend the CC&Rs] 'authorized' BCOA to appropriate Parker's property, and BCOA under its imprimatur generated significant revenue" in an effort to recoup Parker's unpaid debts. (*Id.*)  The Court finds no error in the bankruptcy court's conclusion that the lease of the Property was a willful violation of the bankruptcy stay.

### 6.  Post-Petition Assessments

The bankruptcy court made a separate finding that BCOA sent Parker several invoices seeking payment of her post-petition assessments before she received her Chapter 13 discharge, and that those invoices willfully violated the automatic stay, since BCOA was seeking to collect a pre-petition debt under *Goudelock.*  While Respondents' appeal attacks "delinquent assessments,

---

[27]  The decision further cited BCOA's March 10, 2015 Board minutes, which stated, in part: "BCOA is undeterred in its collections efforts by a Member's decision to file bankruptcy, abandon their property, surrender their deed to secured creditors in order to maintain 5 yrs of Federal Bankruptcy protection, and flee the state in order to avoid payment of Member responsibilities to the association."  (Mem. Dec. at 7:21-24.)

United States District Court
Northern District of California

1   fines, and reimbursement costs," it does not separately address the post-petition assessments as a

2   stay violation *per se*, but only addresses those invoices in the context of opposing plaintiff's

3   appeal regarding the contempt ruling.  However, because Respondents purport to attack all

4   grounds for the bankruptcy court's finding of stay violations, the Court notes that Respondents'

5   challenge to these stay violations fails for the same reasons as stated above.

6          **B.     Asserted Errors in Awarding Damages**

7                 **1.     *Emotional Distress Damages (Issues 2 and 8)***

8          Respondents argue that the bankruptcy court erred in imposing $5,000 in emotional

9   distress damages because (i) they were based upon insufficient evidence to support emotional

10   distress award and (ii) the court should not have permitted evidence of emotional distress since it

11   was not included as an issue in the parties' Joint Pretrial Order ("JPO").

12          The amount of any sanctions imposed for a willful violation of the automatic stay is

13   reviewed for an abuse of discretion.  *In re Leetien*, 309 F.3d at 1213.  Emotional distress damages

14   may be awarded when it is "clearly established" that the debtor suffered significant emotional

15   harm.  *In re Snowden*, 769 F.3d at 657.  An individual may establish emotional distress damages

16   in several different ways, including corroborative witness testimony or expert medical opinion.  *In*

17   *re Dawson*, 390 F.3d 1139, 1149 (9th Cir. 2004), abrogated on other grounds as stated in *In re*

18   *Gugliuzza*, 852 F.3d 884, 897 (9th Cir. 2017).  Significant emotional distress may also be shown,

19   even in the absence of corroborative evidence, if the violator's conduct was egregious or if

20   circumstances "make it obvious that a reasonable person would suffer significant emotional

21   harm." *Id.* at 1150 (citing, *inter alia*, *In re Flynn*, 185 B.R. 89, 93 (S.D.Ga.1995) [emotional harm

22   arose when debtor was forced to cancel her son's birthday party due to improperly frozen

23   checking account]); *see also Sternberg v. Johnston*, 595 F.3d 937, 943 n.1 (9th Cir. 2010),

24   *overruled on other grounds by In re Schwartz-Tallard*, 803 F.3d 1095 (9th Cir. 2015) (finding no

25   abuse of discretion in awarding emotional distress damages to debtor where ex-wife sought to

26   hold debtor in contempt for failure to pay spousal support in violation of bankruptcy stay, despite

27   lack of an egregious violation or corroborating evidence, since bankruptcy court determined

28   reasonable person would have suffered significant emotional harm under the circumstances).  In

United States District Court
Northern District of California

1   *Snowden*, the Ninth Circuit upheld a district court's affirmance of an emotional distress award

2   where a creditor cashed a security check in its possession and continued to call debtor's workplace

3   (a hospital) post-petition. *In re Snowden*, 769 F.3d at 657. The court held that, based on the

4   evidence that the "[c]ashing of the check upended both her finances and her efforts to manage her

5   affairs" and her testimony "explaining why the phone calls indeed were 'a big thing'" to a nurse

6   working her shift, emotional distress was established. *Id*.

7        The Court finds no abuse of discretion in the bankruptcy court's decision to award

8   emotional distress damages here. The bankruptcy court acknowledged that Parker's evidence was

9   limited and did not include expert testimony. Such corroborative evidence is not mandatory. *In re*

10  *Dawson*, 390 F.3d at 1150. The bankruptcy court found:

11       Parker's testimony was credible, and it sufficiently and obviously demonstrated
         that she experienced significant emotional harm, and that any reasonable person
12       would have similarly suffered under the circumstances. To summarize: after
         several years of litigation with BCOA, Parker filed a Chapter 13, surrendered Unit
13       990, and moved more than a thousand miles away to Frisco, Texas with the
         expectation that this would terminate the dispute over her pre-petition HOA
14       obligations. Rather than accept this outcome and work productively to find a
         more suitable owner for [the Property], BCOA and its agents repeatedly harassed
15       Parker regarding her pre-petition HOA assessments, instituted disciplinary action
         and issued fines over pre-petition CC&R violations, and in the end, appropriated
16       her property (for which she was still legally liable) to generate rent which BCOA
         claimed as its own. One could reasonably conclude that BCOA was taking Parker
17       to task for filing her Chapter 13, and used her as a cautionary tale should any
         other BCOA member seek to discharge their HOA obligations. Parker testified
18       that BCOA's conduct left her in a state of disbelief, with a sense of hopelessness
         that she would never come to terms with BCOA. She testified that BCOA's
19       conduct made her angry, anxious and depressed and caused her to struggle in her
         work and personal life, all of which she internalized. Her testimony was credible,
20       and given the duration of BCOA's violations, her distress was not fleeting.

21  (Mem. Dec. at 18:17-19:4.) Thus, the Court finds sufficient evidence in the record to support the

22  bankruptcy court's decision.

23       Respondents further argue that the bankruptcy court erred in allowing emotional distress

24  evidence at all because Parker had not included a specific request for emotional distress damages

25  in the final Joint Pretrial Order. "To reverse on the basis of an erroneous evidentiary ruling, we

26  must conclude not only that the bankruptcy court abused its discretion, but also that the error was

27  prejudicial." *In re City of Vallejo*, 408 B.R. 280, 291–92 (B.A.P. 9th Cir. 2009) (quoting *Johnson*

28  *v. Neilson (In re Slatkin),* 525 F.3d 805, 811 (9th Cir. 2008)).

The Court finds no error or prejudice in the bankruptcy court's evidentiary ruling. The objection was raised by Respondents on the first day of trial on the grounds that the JPO did not include any reference to emotional distress, despite multiple iterations of the order, and that counsel was not prepared for such testimony. (BKDkt. No. 273 Trial TR at 26:16-24.) The bankruptcy court ruled:

> I think everyone agrees that the final [pretrial order] that I have received isn't perfect, but I'm allowed to conform the pleadings to the facts. You knew what was coming here and to state — to state otherwise just doesn't — is just not really believable, so the objection's overruled.

(BKDkt. No. 273 Trial TR at 27:13-17.) An additional four days of trial, over the course of four months, was had thereafter. As the bankruptcy court reasoned, "in the Ninth Circuit, emotional distress damages are one component of a Debtor's actual damages under §362(k)" and Respondents had preserved their rights to object to damages in the JPO as well. (Mem. Dec. at 17:22-28 n.20.) Respondents have made no showing that the bankruptcy court abused its discretion as to that evidentiary ruling nor, even if it had, that any error prejudiced Respondents at trial.

## 2. *Punitive Damages (Issue 3)*

Respondents argue that the bankruptcy court erred in imposing punitive damages of $10,000 given insufficient evidence. More particularly, Respondents argue the damages are not appropriate where it only acted to enforce its rights after Parker's surrender of the Property and obtaining relief from the automatic stay and such is the only evidence on its intent. Respondents claim Parker offered nothing to establish that BCOA knew its continued assessments or disciplinary fines were based on pre-petition conduct. Further, Respondents argue the bankruptcy court could not have found BCOA acted with the requisite mental state since the bankruptcy court also found "BCOA believed that the automatic stay did not apply to its 2015 HOA assessments, and its belief, . . . was held in good faith." (Mem. Dec. at 27:13- 15.)

An award of punitive damages requires "some showing of reckless or callous disregard for the law or rights of others." *In re Snowden*, 769 F.3d at 657 (quoting *In re Bloom,* 875 F.2d 224, 228 (9th Cir.1989)). Thus, punitive damages are "appropriate in the context of a stay violation

United States District Court
Northern District of California

when there's a reckless and callous disregard for the law or the rights of others or where the conduct is malicious, wanton, or oppressive." *Id*.  In *Snowden*, the Ninth Circuit found "reckless and callous disregard for the law" demonstrated where a creditor "failed to provide a policy or employee training about how to address debt collection following a bankruptcy filing." *In re Snowden*, 769 F.3d at 657–58.  In *Sundquist*, punitive damages were awarded where Bank of America proceeded with a foreclosure and eviction of a family, despite the foreclosure being void as a violation of the automatic stay and contrary to its own written procedures.  The bankruptcy court found these and concomitant violations of the stay told "a story that smacks of cynical disregard for the law." *Sundquist v. Bank of Am., N.A.*, 566 B.R. 563, 611 (Bankr. E.D. Cal. 2017), *vacated in part on other grounds In re Sundquist*, 580 B.R. 536 (Bankr. E.D. Cal. 2018).

Here, the award of punitive damages took into account the numerous, repeated violations of the bankruptcy stay, which the court described as a campaign to flout the bankruptcy process and collect on debts, both pre-petition and post-petition.  Contrary to Respondents' strained reading of the bankruptcy court's decision, the bankruptcy court's finding that BCOA believed the stay did not apply and held that belief in good faith were made in connection with its ***contempt*** ruling, under the Ninth Circuit's decision in *Taggart*.  BCOA's subjective belief has no bearing on whether a stay violation was committed and does not preclude a finding that it acted in reckless and callous disregard of the law.  On the question of punitive damages under section 362(k), the bankruptcy court found that Parker had established "by a preponderance of the evidence" that "BCOA callously and repeatedly disregarded Parker's rights under the automatic stay" and awarded $10,000 in punitive damages against BCOA only.[28]  The Court finds no legal error or abuse of discretion in the bankruptcy court's decision.

### 3.    *Property Interference Damages (Issue 4)*

Respondents argue that the bankruptcy court erred in awarding Parker damages for its leasing of the property because, once Parker surrendered the property, she had no further rights in

---

[28]  The bankruptcy court declined to award punitive damages as against Patel or Jennings individually.

United States District Court
Northern District of California

it, including the right to receive rent.  For the reasons explained above, the Court finds this argument without merit.  The revesting of the Property in Parker from the bankruptcy estate restored her title to the Property, even if surrender permitted creditors like BCOA to exercise their rights against the Property as secured collateral for her debts.

The bankruptcy court awarded Parker $39,000.00 in damages reflecting six months' rent collected by BCOA from the May 29, 2015 lease to the December 1, 2015 issuance of Parker's Chapter 13 discharge.  The bankruptcy court's award of damages for this violation took into account both the definition of "actual damages" under section 362(k) as well as California law regarding the appropriate measure of damages for wrongful occupation of property.  The court found the damages for this violation of the automatic stay to be reflected by the "reasonable rental value" evidenced by the lease.  *See* Cal. Civil Code § 3334(a) (damages for wrongful occupation of real property generally "include the value of the use of the property for the time of that wrongful occupation . . . ."); Cal. Civil Code § 3334(b) (The property's value under this code section shall be " the greater of the reasonable rental value of that property or the benefits obtained by the person wrongfully occupying the property by reason of that wrongful occupation.").

The Court finds no factual or legal error in the bankruptcy court's decision on this award of damages.[29]

### 4.    *Joint and Several Liability of Patel and Jennings (Issue 7)*

Respondents next argue that the bankruptcy court erred in finding that Patel and Jennings, as individual officers of the BCOA Board, could be liable for a portion of the damages award.  Respondents raised a "business judgment" defense that the individual officers and directors could not be liable under California Corporations Code section 7231.5, which shields officers and

---

[29]   In *Goudelock*, creditors raised an analogous issue of "fairness," arguing that it would be inequitable for debtor to live free in surrendered property just as creditors argue that Parker could not be entitled to rent collected on her surrendered property.  However, in the bankruptcy context, the overriding issue is not equity, but the requirements of the Bankruptcy Code.  As the *Goudelock* court found: "notions of equity and fairness do not override the express provisions of the Bankruptcy Code.  The legislative branch, not the courts, is the appropriate place to balance conflicting policy interests and adjust the Bankruptcy Code accordingly if it is warranted." *Goudelock*, 895 F.3d at 641 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562–63 (1990)).

United States District Court
Northern District of California

1  directors of non-profit organizations from direct liability for negligent conduct when they are

2  acting in good faith in the organization's interest and exercising reasonable care.[30]  Respondents

3  argue that Patel and Jennings complied with the Davis-Stirling Act and the CC&Rs in assessments

4  and notices to Parker, and they "reasonably believed those assessments were lawful."  (Opening

5  Brief at 29:25-27, 30:2-3.)  Respondents further contend that the bankruptcy court incorrectly held

6  section 362(k) preempts state law.

7      In its Memorandum Decision, the bankruptcy court found that section 362 acts as a stay

8  against all entities, and "applies with equal force to the agents and attorneys who commit the

9  offending acts." (Mem. Dec. at 20:24-25.)  Thus, the bankruptcy court concluded that it could hold

10  a principal and its agent jointly and severally liable for section 362(k) damages caused by the

11  agent if there was "evidence demonstrating that he or she directly committed the act which

12  violated the automatic stay." (Mem. Dec. at 21:25-26.)[31]  The bankruptcy court found that

13

14      [30]  The statute states, in pertinent part:

15  Except as provided in Section 7233 or 7236, there is no monetary liability on the part
   of, and no cause of action for damages shall arise against, any volunteer director or

16  volunteer executive officer of a nonprofit corporation subject to this part based upon
   any alleged failure to discharge the person's duties as a director or officer if the duties

17  are performed in a manner that meets all of the following criteria:
           (1) The duties are performed in good faith.

18           (2) The duties are performed in a manner such director or officer believes to
           be in the best interests of the corporation.

19           (3) The duties are performed with such care, including reasonable inquiry, as
           an ordinarily prudent person in a like position would use under similar

20           circumstances.

21  Cal. Corp. Code § 7231.5(a).  The applicability of the statute as to any conduct in violation of the
   automatic stay is therefore questionable, since such violations are considered intentional torts, and

22  therefore incompatible with a finding of good faith performance consistent with the standard of
   care.  *See In re Davis*, 177 B.R. 907, 911 (B.A.P. 9th Cir. 1995) ("Willful violation of the

23  automatic stay is an *intentional tort* for which compensatory and punitive damages may be
   awarded.") (emphasis supplied); *Stinson v. Bi-Rite Rest. Supply Inc. (In re Stinson),* 295 B.R. 109,

24  121 (Bankr. 9th Cir. 2003), *affirmed in part and reversed in part by Stinson v. Cook Perkiss &
   Lew (In re Stinson),* 128 Fed.Appx. 30 (9th Cir.2005); *see also* 8 Miller & Starr: CAL. REAL

25  ESTATE § 28:48 (4th ed) (the immunity in section 7231.5 "does not apply to the acts of an officer
   or director that are intentional, wanton, reckless, or grossly negligent, nor does it extend to an

26  action for fraud, oppression, or malice").

27      [31]  The bankruptcy court's decision cited several authorities finding individual agents liable
   for damages under section 362(k), including *Sternberg,* 595 F.3d 937 (ordering award of damages

28  for emotional distress against attorney who violated automatic stay by seeking overbroad state
   court order for non-payment of spousal support against debtor) and *In re Crawford*, 388 B.R. 506,
   (*cont.*)

United States District Court
Northern District of California

Jennings' and Patel's affirmative acts in executing the lease "violated § 362(a)(6), and as a result, Patel, Jennings and BCOA are jointly and severally liable for the $39,000 property right damages award." (Mem. Dec. at 22:17-19.)[32]

While Respondents spill much ink on the question of whether federal bankruptcy law preempts California Corporations Code section 7231.5, the Court need not reach that issue here. Respondents' appeal attacks the bankruptcy court's imposition of direct liability against the individual officers on the grounds that they had a good faith belief their *assessments and notices* were lawful under existing authorities. However, the bankruptcy court did not impose individual liability on this basis. Instead it found Patel and Jennings individually liable for damages based upon their conduct in ***executing the lease***. Respondents offer no explanation or evidence as to why such conduct was undertaken in good faith and consistent with a reasonable standard of care so as to be covered by the immunity in Corporations Code section 7231.5. Thus, even if section 7231.5 were not preempted by the Bankruptcy Code, Respondents have not shown that the rule could have shielded Patel and Jennings from individual liability for their wrongful, intentional conduct here.[33]

**C.      Asserted Errors in Attorneys' Fee Award (Issues 5 and 6)**

---

522 (Bankr. S.D.N.Y. 2008), *vacated in part on other grounds,* 476 B.R. 83 (S.D.N.Y. 2012) ("[t]he fact that HSBC sent its servicing agent in its place to 'take one for the team' does not constrain this Court to sanction only the agent. . . . as the principal, HSBC is liable [and its agent] Mr. Didonato is also personally liable").

[32] With respect to emotional distress damages, the bankruptcy court found that Parker had not offered sufficient evidence for the court to attribute specific amounts of emotional distress damages to any individual respondent.

[33] BCOA's citation to *Davis v. Yageo Corp.*, 481 F.3d 661, 678 (9th Cir. 2007) for the principle that state corporate governance law takes precedence over the Bankruptcy Code is unavailing. In *Davis*, the Ninth Circuit held that claims of breach of fiduciary duty were not preempted by the Bankruptcy Code because they concerned conduct that occurred *prior* to bankruptcy. *Id*. The court distinguished alleged abuse of process or malicious prosecution for events taking place *within* the bankruptcy proceedings which clearly would be preempted by the Bankruptcy Code. *Id*. (citing cases); *see also MSR Expl., Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 915 (9th Cir. 1996) (finding malicious prosecution action against creditors "completely preempted by the structure and purpose of the Bankruptcy Code" based on "the unique, historical, and even constitutional need for uniformity in the administration of the bankruptcy laws is another indication that Congress wished to leave the regulation of parties before the bankruptcy court in the hands of the federal courts alone" and the remedies Congress provided for misuse of the bankruptcy process, including section 362).

1    Respondents next argue that the bankruptcy court's award of attorneys' fees should be

2    reversed.  Respondents contend the bankruptcy court erred in three ways: (1) it awarded fees

3    incurred for litigating matters beyond the scope of a violation of the automatic stay under section

4    362(k) since the trial time was focused "almost exclusively" on the contempt allegations, which

5    were denied; (2) the award of $369,346.90 was not reasonable for litigating a consumer stay relief

6    motion in any event; and (3) it failed to consider whether Parker had made sufficient efforts to

7    mitigate attorneys' fees.

8    An award of attorney's fees under 362(k)(1) is reviewed for abuse of discretion.  *In re

9    Schwartz-Tallard*, 803 F.3d 1095, 1101 (9th Cir. 2015); *In re Roman*, 283 B.R. 1, 7 (9th Cir. BAP

10    2002).  An abuse of discretion is shown where the reviewing court has the definite and firm

11    conviction that the bankruptcy court committed a clear error of judgment. *Mendez v. Salven (In re

12    Mendez),* 367 B.R. 109, 113 (9th Cir.BAP2007); *see also In re Strand*, 375 F.3d 854, 857 (9th Cir.

13    2004).  The reviewing court will not disturb the bankruptcy court's factual findings made in the

14    course of awarding fees unless clearly erroneous.  *See Friedman Enters. v. B.U.M. Int'l Inc. (In re

15    B.U.M. Int'l, Inc.),* 229 F.3d 824, 830 (9th Cir. 2000).  An award of fees and costs under section

16    362(k)(1) will be upheld "unless it is clearly unsupported by the evidence or grossly excessive,

17    monstrous, or shocking to the conscience." *In re Roman*, 283 B.R. at 11.

18    Although fees and costs are awarded as actual damages under section 362(k), "the same

19    principles that govern the award of professional compensation under § 330 also guide the

20    allowance of fees and costs under § 362(k)." *Roman*, 283 B.R. at 9-11; *see also Sundquist*, 566

21    B.R. at 588.  Attorneys' fees are generally determined by using the "lodestar" approach and by

22    considering the particular circumstances of each case.  *Roman*, 283 B.R. at 11; *Sundquist*, 566

23    B.R. at 594-95.  However, a debtor must still attempt to mitigate her damages, including the

24    attorney's fees and costs incurred.  *Roman,* 283 B.R. 1, 11.  One way to determine whether a

25    debtor has complied with her duty to mitigate is to consider who caused the attorney's fees to be

26    incurred – the debtor or her creditors. *Id.*

27    On March 2, 2019, Fong submitted a fee application for 1,220.8 hours for total fees of

28    $438,890.00 incurred in litigating the stay relief motion.  (BKDkt. No. 302.)  The bankruptcy

United States District Court
Northern District of California

United States District Court
Northern District of California

court conducted an April 1, 2019 hearing on the Application and issued its award on April 29,

2019.  (BKDkt. No. 315 ["Fee Award"].)  The bankruptcy court noted that it had presided over the

case since its inception in October 24, 2014 through the five-day trial of the stay and discharge

violations in 2018.  It found the stay relief litigation was unusual in a number of respects,

including: extensive fact and expert discovery, including discovery disputes requiring court

intervention;  a trial that did not conclude until almost three years after the initial stay relief

motion was filed; summary judgment; several status conferences; and disputes over the contents of

a pre-trial order.  (Fee Award at 2.)  The bankruptcy court, based its review of the fee submissions,

briefing, and arguments, reduced the fees requested for several reasons:

- time recorded before January 14, 2015 was not awardable ($3,890.00 reduction);
- time preparing the section 362(k) motion was excessive and "reasonably should have taken approximately 100 hours" ($22,400.00 reduction);
- Parker's objection to the BCOA claim was unnecessary and fees unreasonable ($4,690.00 reduction);
- a portion of the time spent on the joint pretrial order, for which Parker's counsel was sanctioned by the court due to inadequate preparation ($4,565.00 reduction);
- time preparing an expert on HOA and Davis-Stirling issues who ultimately was excluded from trial ($10,750.00 reduction);
- time spent opposing a motion to exclude Parker's proffered medical expert who ultimately was excluded ($2,800.00 reduction);
- excessive time spent on the settlement conference brief in light of other motion work ($2,450.00 reduction);
- time that was not clearly related to the stay violations ($1,575.00 reduction);
- fees previously paid counsel as to which court could not determine whether reimbursement was required ($5,000.00 reduction); and
- a general 3% reduction due to the excessive clumping of time and the repeated failure to sufficiently describe the work done.

(*Id.* at 2-5.)

The bankruptcy court further found that although the "amount significantly exceeds the

other actual damages awarded. . . . this contested matter was hard fought, substantial litigation

which addressed several novel issues.  The fees award is therefore reasonable."  (Fee Award at

5:8-10.)  The bankruptcy court addressed and dismissed Respondents' contentions that the stay

violations found would not have occurred if Parker had raised them sooner, finding that:

The facts adduced at trial do not support this argument. This case is unlike the typical stay violation contested matter where the violations consist of the same act carried out multiple times. Here, the violations included post-petition demands to settle pre-petition litigation, collection of pre-petition HOA fees, imposition of HOA fines for from pre-petition violations, and the rental of Unit

> 990. These violations were spread out of the course of several months. In addition, respondents never testified that they would have altered their conduct if they had received a cease and desist letter. Respondents testified at trial that they believed that their actions complied with applicable law and, given the disparate nature of the acts that violated the stay, it is not clear that any one cease and desist letter would have put BCOA on notice that its other acts violated the stay.

(Fee Award at 3:14-23.)

In light of the bankruptcy court's extensive findings regarding reasonable fee and consequent reductions, Respondents' arguments fail.  Respondents' broad-brush attack on the order disregards the extensive proceedings in the litigation, the detailed consideration the court apparently gave the fee submission stated in its order, and the court's findings regarding mitigation efforts.  Respondents point to no examples of time spent on unrelated matters that was not otherwise disallowed, nor anything other than speculation as to whether Parker could have mitigated its campaign to recoup debts arising pre-petition.  (*Cf., e.g.,* Trial Ex. W [March 10, 2015 Board minutes stating BCOA is "undeterred in its collections efforts by a member's decision to file bankruptcy."].)  The Court finds no clear error or abuse of discretion in the bankruptcy court's attorneys' fee determination.

## CROSS-APPEAL OF SARAH-JANE PARKER

**I.    ASSERTED ERROR IN CALCULATION OF PROPERTY INTERFERENCE DAMAGES**

In her cross-appeal, Parker first argues that the bankruptcy court applied the wrong law to its calculation of stay violation damages.  More specifically, with respect to the lease of the Property, the bankruptcy court calculated damages only to the date of discharge rather than the date the property was sold in December of 2016.  Accordingly, the court only awarded damages based the $39,000 in rent BCOA had collected as of December 1, 2015, and not the additional rent it received, at a rate of $6,500 per month thereafter.  Parker also seeks attorneys' fees incurred in seeking those further damages.

The Ninth Circuit established in *In re Snowden* that damages for a stay violation may continue past the conclusion of the stay itself.  *In re Snowden*, 769 F.3d 651, 659 (9th Cir. 2014).  In *Snowden*, the Ninth Circuit found that the reviewing district court abused its discretion by cutting off damages for a stay violation at the time a creditor made a tender offer for property it had seized in violation of the stay.  *Id.*  The stay violation did not cease at the time of the tender

offer, but instead continued because the creditor had "affirmative obligation to return any property it had wrongfully seized from the bankruptcy estate." *Id*. (citing *In re Abrams,* 127 B.R. 239, 242–43 (9th Cir. BAP 1994)).  The Ninth Circuit therefore held that the damages should include those incurred in the litigation leading up to a finding of a stay violation and remanded for a recalculation of damages.  *Id*.

While the ruling in *Snowden* was focused on attorneys' fees as an item of damages under section 362(k), other courts have concluded that all appropriate damages under section 362(k) "continue to accrue until full restitution is made. . . . [and] encompass all consequences proximately caused by the stay-offending conduct for so long as those consequences continue, regardless of whether the stay has expired."  *Sundquist*, 566 B.R. at 571; *see also In re Snowden*, 769 F.3d at 662 (Watford, J., concurring) (stay violation generally continues until creditor returns the property to debtor).  Relying on *Snowden* and *Sundquist*, the bankruptcy court in *In re LeGrand* recently concluded that "[a]n automatic stay violation that continues post-discharge remains eligible for § 362(k)(1) remedies, including actual damages, costs and attorneys' fees, and, punitive damages, until the stay violation is purged by actual restitution," since it is merely a continuation of the same pre-discharge conduct that violated the automatic stay."  *In re LeGrand*, 612 B.R. 604, 613 (Bankr. E.D. Cal. 2020) ("It would be an odd system that strips an individual debtor of the potent § 362(k)(1) statutory punitive damages remedy against a creditor violating the automatic stay in bad faith but then holds that, because the stay violation persisted past entry of discharge, the § 524 discharge injunction insulates that same bad actor with civil contempt's milder least-possible-exercise-of-power approach of civil contempt.").

In its Memorandum Decision, the bankruptcy court simply stated that "Parker is awarded $39,000.00 in damages arising from the interference with her property rights in [the Property]. This amount reflects the monthly rent collected by BCOA from when it executed the lease to the issuance of Parker's Chapter 13 discharge."  (Mem. Dec. 20:17-19.)  It is not clear whether the bankruptcy court believed it was legally constrained to limit the scope of damages arising from the lease to those incurred prior to the discharge order, contrary to the above authorities.  Therefore, the Court vacates and remands for additional findings on the amount of damages consistent with

1  this Order.

2  **II.   ASSERTED ERROR REGARDING LEGAL STANDARD ON CONTEMPT CLAIMS**

3         Parker next argues that the bankruptcy court applied the wrong legal standard in its

4  decision to deny her contempt claims arising from Respondents' discharge and stay violations in

5  light of the Supreme Court's recent decision in *Taggart v. Lorenzen*.  Parker contends this is a *per*

6  *se* abuse of discretion and requires reversal and remand.

7         Parker moved for contempt under Bankruptcy Code section 105 based on Respondents'

8  stay violations and on violations of the discharge injunction under Bankruptcy Code section

9  524(a)(2).  Parker sought contempt sanctions based on the stay violations and, in addition, raised

10  two violations occurring after the discharge order was entered on December 1, 2015: (1) BCOA's

11  April 2, 2016 "Late Payment Demand and Notice of Delinquency" (Trial Ex. AT) seeking

12  $81,855.79 in post-petition assessments, disciplinary fines, retro-assessments, and related finance

13  charges, and (2) BCOA's collection of post-discharge rents on the Property.

14         The Court first reviews the bankruptcy court's logic.  First, it found that the April 2, 2016

15  invoice showed a zero balance for pre-petition assessments, presumably recognizing the effect on

16  the discharge as to those amounts, but then it demanded payment for assessments for post-petition

17  amounts.  (Mem. Dec. at 26:14-22.)  The bankruptcy court found that "[w]hile this court believes

18  that Parker discharged the 2015 and 2016 annual HOA assessments, this clarity is a product of

19  *Goudelock,* a Ninth Circuit decision issued only a few months before trial," and Respondents

20  believed that the post-petition assessments were not subject to the stay.  With respect to the

21  continued collection of rent, the bankruptcy court declined to find contempt because "respondents

22  had a good faith belief" that Parker was liable for the post-petition assessments and there was not

23  clear and convincing evidence as to how BCOA used the rents it collected.  (Mem. Dec. 27:3-8.)

24         In terms of a legal framework, Bankruptcy Code § 524(a)(2) provides that a bankruptcy

25  discharge "operates as an injunction against the commencement or continuation of an action, the

26  employment of process, or an act, to collect, recover or offset any such debt as a personal liability

27  of the debtor . . . ."  Section 524(a)(2) does not provide a private right of action.  *See Walls v.*

28  *Wells Fargo Bank, N.A.*, 276 F.3d 502 (9th Cir. 2002).  Instead, a debtor may only seek redress

United States District Court
Northern District of California

1    through a contempt finding under Bankruptcy Code § 105(a).  A bankruptcy court's decision to

2    deny a contempt motion is reviewed for abuse of discretion.  *In re Freeman*, 608 B.R. 228, 233

3    (B.A.P. 9th Cir. 2019).  Application of the wrong legal standard is an abuse of discretion.  *Id.*

4    Here, the bankruptcy court's Memorandum Decision stated the applicable standard as

5    follows:

> To prevail, Parker must establish by clear and convincing evidence that BCOA
> (1) knew the discharge injunction was applicable and (2) intended the actions
> which violated the injunction.  ["]The burden then shifts to the contemnors to
> demonstrate why they were unable to comply." *Lorenzen v. Taggart (In re
> Taggart)*, 888 F.3d 438, 443 (9th Cir. 2018).  The Ninth Circuit recently made
> clear that a "creditor's good faith belief that the discharge injunction does not
> apply to the creditor's claim precludes a finding of contempt, even if the
> creditor's belief is unreasonable." *Lorenzen v. Taggart*, *supra* at 444.

11   (Mem. Dec. 25:21:27.)  The bankruptcy court also noted in its decision that the United States

12   Supreme Court had granted certiorari to review *Lorenzen v. Taggart* just a few weeks earlier,

13   though neither party had requested a stay in light of the grant of certiorari.  (*Id*. at 27:26-28 n.25.).

14   Subsequently, on June 3, 2019, the Supreme Court reversed the Ninth Circuit's decision in

15   *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1802 (2019).  There, the Supreme Court held that contempt

16   in the bankruptcy context must be decided under an objective standard that asks whether there is a

17   "fair ground of doubt as to the wrongfulness of the defendant's conduct."  *Id*.  "[A] party's

18   subjective belief that she was complying with an order ordinarily will not insulate her from civil

19   contempt if that belief was objectively unreasonable."  *Id.*  Thus, contempt can be found where

20   "there is no objectively reasonable basis for concluding that the creditor's conduct might be

21   lawful."  *Id*. at 1799.

22   Three months later, a October 29, 2019 decision of the Ninth Circuit Bankruptcy Appellate

23   Panel held that the Supreme Court's decision "changed the metrics of decision after the

24   bankruptcy court ruled" and required a decision made under the old standard to be vacated and

25   remanded in light thereof.  *In re Freeman*, 608 B.R. 228, 234 (B.A.P. 9th Cir. 2019).

26   Given the bankruptcy court's findings that the same conduct, pre-discharge, constituted a

27   willful violation of the stay, the Court finds it appropriate to vacate and remand that portion of the

28   bankruptcy's decision denying Parker's contempt motion for further consideration in light of the

United States District Court
Northern District of California

44

objective standard announced in *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1802 (2019).

## **CONCLUSION**

For the foregoing reasons, the Court **AFFIRMS** the decision of the bankruptcy court with respect to all issues raised on appeal by Respondents, and **VACATES AND REMANDS** for further consideration those portions of the Memorandum Decision and Fee Award concerning: (1) calculation of damages for violation of the stay based on BCOA's lease of the property; and (2) the motion for contempt.

**IT IS SO ORDERED.**

Dated: **March 22, 2021**

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**